PIONEER SAVINGS AND LOAN COMPANY ET AL. v. PECK & FLY.

Decided December 14, 1898.

**1. Practice on Appeal—Removal of Cause.**

The refusal of the trial court to grant an application for the removal of the cause to a Federal court can not be complained of on appeal, where the transcript of the record was filed in the Federal court, which determined that it had no jurisdiction and remanded the cause.

**2. Plea of Privilege—Negativing Exceptions.**

A defendant who pleads his privilege of being sued in the county of his residence should negative the existence of every state of facts under which the pleading and scope of the remedies asked would give the court jurisdiction.

**3. Venue—Stock Certificate—Removing Cloud from Title.**

A suit to recover upon a stock certificate of a savings and loan company and to cancel a trust deed upon land given by the stockholders, as being a cloud upon his title, is properly brought in the county where the real estate is situated, although the certificate of the shares of stock provided that any suit thereon should be brought in the county of the defendant company's domicile.

**4. Action Not Prematurely Brought Against Savings Associations.**

An action to recover upon certificates of stock of a savings and loan company is not prematurely brought, although commenced prior to the ninety days after maturity allowed to the defendant in which to settle, where prior to suit brought it had repudiated its contract.

**5. Same—Suit by Attachment.**

An action is not prematurely brought where, although instituted before the maturity of the obligation sued on, it is brought by attachment, and judgment is not rendered until after such maturity.

**6. Injunction—Error as to Temporary, Immaterial.**

Whether an affidavit was sufficient to warrant a temporary injunction or not is immaterial where there was no motion made to dissolve it before a final hearing of the cause upon which it was determined that the plaintiff was entitled to a perpetual injunction.

**7. Removal of Cloud from Title—Tender of Certificates for Cancellation.**

In a suit against a savings and loan association to cancel a mortgage as a cloud on title because the debt secured has been discharged, the plaintiff need not tender for cancellation the certificates of stock which evidence the defendant's liability to him.

**8. Opinion of Witness as to Insolvency—Immaterial Error.**

That a witness in a case tried by the court without a jury was improperly permitted to state whether in his opinion the defendant corporation was at a particular time a solvent concern, is not reversible error, where, aside from such testimony, the uncontroverted evidence showed that the corporation was a going concern.

**9. Deposition—Striking Out Irrelevant Answers.**

Testimony contained in a deposition not pertinent to the interrogatories propounded may be stricken out under article 2291, Revised Statutes.

**10. Opinion of Witness Not Evidence, When.**

A witness can not be permitted to state conclusions drawn from facts shown by exhibits or give his opinion as to what is the law, or as to what constitutes insolvency.

**11. Practice—Harmless Exclusion of Evidence.**

The exclusion of evidence is not prejudicial where the same facts were fully shown by other testimony.

**12. Corporation—Attachment.**

A creditor of an insolvent corporation who is also a stockholder may obtain a preference by an attachment levied while it is a going concern.

**13. Estoppel—Construction of Contract.**

One who, to induce another to enter into a contract, makes written representations placing a certain construction upon the agreement, is estopped from thereafter insisting upon any other construction.

**14. Mutual Benefit Association—What Is Not.**

A savings and loan company which confers upon its shareholders only the right to vote at stockholders meetings and to receive a specified sum on their holdings at a certain period, and which limits their liability to the payment of dues, fines, and forfeitures, is not a mutual benefit association.

APPEAL from Gonzales. Tried below before Hon. M. KENNON.

*John A. Green, John A. Green, Jr.,* and *Geo. D. Emery,* for appellants.

*Harwood & Walsh* and *Thos. McNeal,* for appellees.

NEILL, ASSOCIATE JUSTICE.—This suit was instituted on the 29th day of January, 1897, by appellees against appellants to enjoin the sale of certain real property of appellees, situated in Gonzales County, under the deed of trust mentioned in our conclusions of fact; to cancel said deed of trust and to recover a balance of $5000, with interest from the 6th day of January, 1897, alleged to be due by appellant corporation to appellees upon its contract or stock certificate, mentioned in our conclusions of fact. An original attachment was sued out by appellees at the time the suit was instituted, and afterwards levied upon real estate of appellant corporation, situated in several counties of this State. A writ of injunction restraining the sale was also issued.

The appellees alleged in their petition that they were residents of Gonzales County, Texas; that the Pioneer Savings and Loan Company was a

foreign corporation, duly incorporated under the laws of the State of Minnesota, and having its place of business in the city of Minneapolis, Hennepin County, Minnesota; that appellant, John F. Elliott, was a resident citizen of Dallas County, Texas, and that appellant corporation had no agent in this State.

On the 5th of July, 1897, the appellant, John F. Elliott, trustee in said deed of trust referred to, filed his original answer, which contained a general demurrer, a special exception, a general denial and a special plea setting up in full the terms of the trust deed declared on by appellees, but asserted that no demand had been made on him by his codefendants to execute the power of sale contained in said instrument. On the same day the Pioneer Savings and Loan Company filed its petition and bond for the removal of this cause from the District Court of Gonzales County to the Circuit Court of the United States in and for the Western District of Texas at San Antonio. The ground for removal alleged in the petition is that while John F. Elliott, the codefendant, would answer to the merits, as a citzen of Texas, the Pioneer Savings and Loan Company is a resident of the State of Minnesota, and that the substantial controversy in this case is between the plaintiff and the loan company, and that there is a separable controversy between plaintiff and said loan company in which the said Elliott is not interested.

On the 6th day of July, 1897, Peck & Fly filed special exceptions to the petition for removal, which were on the same day sustained, and the removal denied. Thereupon the Pioneer Savings and Loan Company entered its protest against the action of the District Court of Gonzales County, retaining jurisdiction of the cause, and in open court requested the clerk of said court to make out for its use a transcript of the record in this cause to be filed in said Circuit Court of the United States. The loan asociation then filed its motion to quash the notice served on it as a nonresident defendant, whereby it was cited to appear and answer in this cause, on the ground that the notary's certificate to the oath of the person making the service did not sufficiently describe his official character. This motion was sustained by quashing the service on said appellant, and the case was, for that reason, continued by operation of law to the January term, 1898.

Appellant then procured a transcript of the record in this cause from the district clerk, and filed it, with its petition for removal and bond, in the Circuit Court of the United States for the Western District of Texas, at San Antonio. The case was docketed in said court under its present style, and numbered 630. On November 29, 1897, appellees presented in that court their motion to remand the cause to the District Court of Gonzales County, on the ground that the United States court had no jurisdiction to determine said cause, and, after argument, said motion was granted and the cause remanded to the District Court of Gonzales County, Texas.

Afterwards, at the January term, 1898, of the District Court of Gon-

zales County, appellant company filed therein its three several pleas in abatement. The first challenged the jurisdiction of the court on the ground that appellant was a foreign corporation with its principal office in Minneapolis, Hennepin County, Minnesota. That it had no agent in Gonzales County, but had an agent, to wit, W. L. Diamond, residing in Dallas County, Texas. The second plea in abatement set up an agreement in the certificate sued upon to the effect that any suit or action brought against appellant company, should be brought within six months after the right of action accrued, and only in the county of Hennepin, State of Minnesota. Its third plea in abatement set up the sixteenth section of article 2 of the by-laws on the back of the certificate, in which it is provided that the union should have ninety days after filing proof of claims and approval thereof, and after the maturity of shares, whether by death, withdrawal or otherwise, in which to pay the same, and that the certificate matured January 1, 1897, and the suit was filed on January 22, 1897.

The first plea in abatement was, on exceptions of appellees, stricken out because it did not state that any part of their cause of action accrued in Gonzales County. Exceptions to the second plea in abatement were also sustained. To the third plea in abatement, appellees plead in replication facts which they alleged constituted a waiver of the section of the by-laws mentioned in said plea.

The appellant company excepted to the sufficiency of the replication, but its exception was overruled. It then filed a general denial, a long special plea in which it was contended that appellees, by accepting the certificate for stock sued upon, became members of a mutual corporation, liable to share its losses as well as its profits. And, that though appellant may have agreed to pay $100 at the end of six and one-half years for each share of stock, such agreement was made subject to the terms and conditions of the by-laws attached to the certificate. That there had been such great loss and expense incident to the business of the corporation that the actual book value of appellees' stock was $5980, instead of $10,000, at its supposed maturity date; and that upon an adjustment of the affairs of appellees and appellant, the latter was indebted to the former in the sum of $980, instead of $5000 sued for, which sum of $980 was by appellant tendered in its pleadings to appellees.

The case was tried before the court without a jury, and judgment rendered in favor of appellees against both appellants, perpetuating the injunction, and against the appellant corporation for the sum of $5000, with interest, together with a foreclosure of appellees' attachment lien. From this judgment the Pioneer Savings and Loan Company, as well as John F. Elliott, has appealed to this court.

*Conclusions of Fact.*—First. The National Building, Loan, and Protective Union was organized and incorporated on January 13, 1886, under the provisions of the statutes of Minnesota, and conducted its business under the name of the National Building, Loan, and Protective Union

from the time of its organization to the 26th day of May, 1891, at which time it amended its articles of incorporation so as to change its name to the Pioneer Savings and Loan Company, by which name it has ever since existed and been known. Such change of name and amendment of its articles did not in any way change its identity, but it continued its business under its changed name as formerly, possessing the same assets, with the same powers, duties, and obligations, with the same books and records, and managed by the same officers as before.

Second. After stating the name, the charter of the National Building, Loan, and Protective Union is as follows:

"2. The general nature of the business to be transacted by the corporation shall be carrying on the business of a building and loan association, the purchase, sale, and holding of real estate, lands, tenements, and hereditaments, the building of houses and the improvement of real estate, by the raising of funds to be loaned to its members for such purposes, the issuance of shares of stock of the corporation to its members, and the collection of membership fees, dues, assessments, and premiums on the same, mortgaging and leasing of real estate, loaning and investing the moneys and funds of the corporation.

"3. This corporation shall commence on the 12th day of January, A. D. 1886, and shall continue thirty years.

"4. The capital stock of this corporation shall be fifty million dollars, divided into five hundred thousand shares of one hundred dollars each, which stock shall be represented by the subscription of shares by its members to be paid in such installments as may be provided by the by-laws of the corporation. The capital stock may be increased at any time by the board of directors as provided by the laws of the State of Minnesota. The corporation may commence business when one thousand shares of stock have been subscribed.

"5. The highest amount of indebtedness or liability to which this corporation may at any time be subject, shall be fifteen thousand dollars above its liabilities to its members on its certificates of shares, but such indebtedness or liability may be increased for the purpose of redeeming its certificates to an amount not to exceed fifty thousand dollars."

The sixth, seventh, eighth, and ninth paragraphs of the charter relate to the organization of the union, and are not material to this cause.

"10. The board of directors shall from time to time adopt by-laws, rules, and regulations for the government of the association and the conduct of its business."

Third. Shortly prior to June 11, 1890, the appellees, B. N. Peck and W. M. Fly, composing the firm of Peck & Fly, having determined to construct a three-story brick business house, in the town of Gonzales, on real estate owned by them on one of the principal streets of said town, had under advisement the desirability of borrowing the sum of $6000 from the appellant company, to be used therein, and with that purpose in view, read and considered the prospectus, loan plans, and printed literature issued by the said company, and not being satisfied that they fully

understood and interpreted the same, they caused W. J. Bright, the local agent of the appellant company, at Gonzales, Texas, to address a letter to the principal office of the appellant company at Minneapolis, Minn., on June 11, 1890, to which a reply was received by the said W. J. Bright, by letter of date June 17, 1890, and by him delivered to the plaintiffs, Peck and Fly. In this letter, the appellant company proposed to the appellees that, in case they borrowed any money, they must take out 25 per cent more stock than the amount of money borowed, the loan to mature at the maturity period of the stock; and that, at that time, the company guaranteed to pay $100 per share of the stock and cancel the loan, paying appellees the difference between the maturity value of the stock and the amount of the loan. They recommended the "Series C Plan," in which there is a straight payment of 85 cents per share per month for six and one-half years, no assessments, and nothing returned at maturity, except $100 per share on the stock held, and stating that it would be out of the power of the company to change its contracts thus made or impose any additional penalties without the consent of the borrower and stockholder. In this letter the company expressly guaranteed the shares to be paid at their face value in six and one-half years from their date.

Afterwards, to wit, on the 23d day of June, 1890, the appellees accepted the terms and explanations of the appellant company as to the effect and interpretation of their method of transacting business, and concluded to make application for 100 shares of Series C stock, and borrow six thousand dollars ($6000) from said company, to be used in the construction of the aforesaid building or business house in the town of Gonzales. At the time appellees determined to make application for the said shares and loans, they were furnished by the appellant company with a printed copy of their fourth annual financial report, of date January 11, 1890, which report showed the company to be in a sound and solvent financial condition, and amply able to fulfill its obligations. Afterwards, on June 23, 1890, the appellees, Peck and Fly, made application, in writing, to the National Building, Loan, and Protective Union, of Minneapolis, Minn., for 100 shares in Series C stock, of the maturity face value of $10,000, which, by its terms became a part of the contract between the appellee and the appellant company.

Fourth. On the 1st day of July, 1890, the National Building, Loan, and Protective Union accepted appellees' application for 100 shares in its Series C stock, and issued to Peck & Fly on that date, an obligation, termed a certificate of shares No. 25,748, for 100 shares of Series C of the face value of ten thousand dollars ($10,000), which certifies that they are constituted a shareholder in said union, and hold 100 shares therein, of $100 each, and in consideration of their payment of the admission fee, together with their performance of all agreements, and their full compliance with the terms and conditions and by-laws printed on the front and back respectively of said certificate, which are therein referred to and made a part of the contract, the said union agrees to pay appel-

lees or their heirs, executors, administrators, or assigns, the sum of $100 for each of said shares at the end of six and one-half years from the date thereof, payable in the manner and upon the conditions set forth in the by-laws to said certificate. The certificates are payable by the terms thereof, only at the office of the union, at Minneapolis, Minn., and within ninety days after the acceptance and approval of satisfactory proofs.

The terms and conditions printed on the certificate, among others, are as follows:

"First. The shareholder hereby agrees to pay or cause to be paid, a monthly installment of sixty cents per month on each share named in the certificate, and a quarterly installment of twenty-five cents on each share. The first quarterly installment is payable with the first monthly installment, and one with each third monthly installment thereafter, during the continuance of this certificate, and a further sum of twenty-five cents on each share as a withdrawal installment, for each month in which there is no quarterly installment payable as before specified. The monthly, quarterly, and withdrawal installments are each and all payable to the secretary of the union without notice, on or before the last Saturday of the month in which they respectively fall due.

"Second. If the shareholder shall fail to pay any monthly installment, quarterly installment, withdrawal installment, or interest, and premium on his loan when due, he shall pay a fine for each delinquency, of ten cents per share on each delinquency on each share of his stock for the first month of such delinquency, and twenty cents per share for the second month, and thirty cents per share for the third month, and if all such monthly, quarterly, and withdrawal installments, and all such interest and premium, and fines be not fully paid within ninety days after such first delinquency, this certificate shall wholly lapse, and this contract shall wholly cease and become null and void as to any promise or obligation of the union, and all of the payments made upon this certificate shall thereupon be and become the absolute property of the union, and the union shall thereupon not be liable for any sum whatever on this certificate; provided, however, that the provisions of this clause shall be subject to the right of withdrawals of stock hereinafter provided in the clause in relation to withdrawals.

"Tenth. The union reserves the time and right to make an investigation in all cases prior to the approval of claims.

"Eleventh. The by-laws of the union which are attached to and indorsed hereon, are a part and parcel of this contract, and such by-laws and this certificate are to be construed together, as a part of the same contract between the union and its members.

"Twelfth. This certificate of stock may be sold or assigned by the legal holder thereof when all payments have been made to the union and all conditions complied with up to the time of such assignment, provided the stock has not been assigned as collateral security, to a loan. Such assignment shall be noted on the books of the union and approved by

the secretary. In case of an assignment or the issuance of a new certificate, a fee of one dollar shall be paid.

"Thirteenth. The holder of this certificate shall have no claim or interest in the affairs, assets, or funds of the union, nor control over them except as specifically set forth in the certificate, or in the by-laws, and he or she assumes no further liability of any kind whatsoever, except as stated in this certificate and the by-laws."

Among the by-laws printed on the back of said certificate, and made a part of the contract between Peck & Fly and the union are the following, to wit:

"Article 1, section 2. The objects of the union are to afford the shareholders a safe and profitable investment, and a protection for their savings and families."

"Article 1, section 3. This union shall be purely mutual. Any shareholder in good standing is entitled to one vote for each share contained in his or her certificate of shares at the annual meeting of the union, either in person or by proxy."

"Article 2, section 1. The certificate of stock and terms and conditions thereof and the by-laws, and the application of membership, form the contract between the union and its several members."

"Article 2, section 2. Persons desiring to become shareholders of the union must make application according to the forms provided for that purpose by the union, and such application forms a part of such member's contract with the union."

"Article 2, section 4. Each member shall be entitled to a loan of seventy-five dollars ($75) for each share held by him or her, providing that he or she holds at least five shares of stock and has made application for a loan in proper form on the blanks furnished by the union for that purpose on real estate situated where the union can legally make a loan on the same, and the same has been submitted to the union and approved, and the loan fund in the treasury warrants it, and there shall be no application ahead of said shareholder's application. All applications for loans when in proper shape, shall be examined in the order in which they are received, and when approved said shareholder shall receive the loan in his or her regular turn. All shares must be in force three months before the shareholder shall be entitled to a loan, or in lieu thereof a shareholder may prepay three months on his shares. * * * The application to the union for a loan is part and parcel of the contract of the member with the union. The union may make loans in greater sums than as stated herein, upon approved securities, when there are not sufficient applications for the same upon approved securities to take all the loan fund at the rate of seventy-five dollars ($75) per share, but no loan can be made except to members, and not to exceed the par value of the shares held. Loans shall not exceed two-fifths of the value of the real estate, and shall be satisfactory to the directors and shall be accompanied by a transfer and pledge of the shares of stock of the borrowers to the union as collateral security for the loan. * * * Negotiations and contracts con-

cerning loans can be made only with the union at its home office, by proper application papers transmitted to the union."

"Article 2, section 5.   *   *   *   All loans, whether upon stock or real estate, shall fall due at the maturity time of the stock. On all loans the member shall pay an interest of five per cent per annum and a premium of five per cent per annum, which are payable in monthly installments at the home office of the union, on or before the last Saturday of each and every month. All real estate loans shall be upon first mortgage security where the title is perfect, and the borrower shall insure the property and keep it insured for the benefit of the union, in such insurance company as shall be approved by the union, using such mortgage clause on the insurance policy as shall be furnished by the union or approved by it."

"Article 2, section 11. If any shareholder shall neglect to pay the interest and premium on his loan, or the monthly, quarterly, or withdrawal installments, or other fees, payments or dues provided for in the note or mortgage or certificate of stock, the union may compel the payment of principal, interest, premiums, fines, and all claims, dues, or fees, by proceedings on his note and mortgage, or otherwise as they may elect, and the note and mortgage shall be and thereby become at once due and payable in full. Time, punctuality, and strict performance on the part of all members, borrowers, and shareholders in the payment of interest, premiums, fines, installments, and all claims and dues, of whatever nature, are hereby made the essence of the contract."

"Article 2, section 13. Each certificate of shares shall be charged with any and all amounts that may be owing by the shareholder to the union, whether in dues, payments, installments, fines, loans, interest, premiums, or other demands at the time of paying said certificate, and the union reserves a lien upon such shares to secure such payments, and the right to deduct and withhold said amounts, together with interest on the same."

"Article 2, section 16. If the union desires further evidence of a claim than is given in the proofs furnished, it reserves the right to extend the time of payment until such necessary investigation can be made. The union shall have ninety days after the filing of proofs of claims and approval thereof, and after the maturity of shares, whether by death, withdrawal, or otherwise, in which to pay the same."

"Article 2, section 17. The by-laws may be amended, supplemented, altered, repealed, or suspended by a two-thirds vote of all the directors of the union, but no such amendment shall alter any contract or certificate already made without the consent of the holders thereof."

There is printed on the back of said certificate the following:

"The National Building and Loan and Protective Union is the only building and loan association governed by the laws of the State of Minnesota which matures its stock at a definite and certain time, and has a definite and certain interest and premium. Therefore, as provided by the laws of Minnesota, this stock has no surrender value and can not be withdrawn until it matures, except in the manner stated in the within certificate. But it can be withdrawn after it has been in force one year by tak-

ing a paid-up certificate, drawing interest, or after it has been in force three years by taking a cash withdrawal of the amount paid into the loan fund with the rates of interest as stated in the within certificate, and the heirs or personal representatives of a deceased shareholder may withdraw same, taking a cash withdrawal at any time. As this union is the first one of its character organized, it has peculiarly favorable concessions made to it in the provisions of the laws of Minnesota, but notwithstanding these favorable concessions, this stock is withdrawable at the same time that the law requires other associations to allow withdrawals, notwithstanding their stock is not matured at a definite and certain time, and that they do not promise maturity of stock as soon as it is promised by this union.

"This stock shall have a market value at all times.

"This stock may be transferred at any time.

"This stock matures at a fixed and definite time.

"This union matures its notes and mortgages at a fixed and definite time."

Fifth. Chapter 236 of the laws of Minnesota, relating to building and loan associations doing a general business, is in part as follows, to wit:

## "Chapter 236, Section VI.

"Every building and loan association heretofore . or hereafter incorporated under the laws of this State, and governed by this act, shall deposit and keep with the State auditor, or with a duly chartered trust company of this State, approved by the public examiner, in trust, for all its members and creditors, all mortgage or other securities received by it in the usual course of business. When deposited with a trust company, such company shall certify to the auditor the possession of such securities, and the same shall not be surrendered without the authority or sanction of the auditor. Provided, that every such corporation heretofore organized, not having or owning mortgage or other securities to the amount of twenty-five thousand dollars ($25,000), shall deposit with the State auditor additional securities, to make, with the securities so owned and deposited, equal in value to said sum, of twenty-five thousand dollars ($25,000), and every such corporation hereafter organized under this act shall deposit and keep with the State auditor aforesaid, securities to the value of twenty-five thousand dollars ($25,000) before commencing to do business. The securities mentioned in this proviso shall consist of bonds or treasury notes of the United States, or national bank stocks, or bonds of this State or any other State of the United States, or of any solvent city, county, or town of this State, or of any other State of the United States, having the legal authority to issue the same, and such securities may be withdrawn from time to time when mortgage securities of corresponding value shall be deposited as provided in this act, or when other securities of like character are substituted therefor, and it shall be the duty of the public examiner from time to time to examine said associations to see whether all its securities are deposited as required by this act. * * *""

"Chapter 236, Section XVIII.

"On or before the first (1st) day of September in each year every build-ing and loan association doing business in this or any other State or Ter-ritory, shall deposit with the public examiner a report of its affairs and operations for the year ending on the thirtieth (30th) day of June imme-diately preceding. Such report shall be verified under oath by the presi-dent and secretary, or by three directors of the association, and shall con-tain answers to the following questions: First. The amount of author-ized capital and the par value of each share of stock. Second. The num-ber of shares sold during the year. Third. The number of shares can-celed and withdrawn during the year. Fourth. The number of shares in force at the end of the year. Fifth. A detailed statement of the re-ceipts and disbursements, of the assets and liabilities, at the end of the year, and shall pay to the public examiner a fee of twenty-five dollars ($25) on filing such report. If any such association shall fail to furnish to the public examiner of this State any report required by this act, at the time so required, it shall forfeit the sum of twenty-five ($25) dollars per day for every day such report shall be delayed or withheld, and the examiner may maintain an action in his name or office to recover such penalty, and the same shall be paid into the treasury of the State, and applied to the expenses of the department of said examiner. After receiv-ing such report, the public examiner, if satisfied that such corporation has complied with all the provisions of this act, and is entitled to do busi-ness in this State, shall issue his certificate stating the compliance with such provisions, and that such corporation is entitled to do business in this State, which certificate shall be in force for the period of one year, unless sooner rescinded as provided in this act.   *   *   *"

"Chapter 236, Section XIX.

"It shall be the duty of each public examiner, at least once in each year, and as often as he may deem necessary, to assume and exercise over every building and loan association incorporated under the laws of this State, its business, officers, directors, and employes, all the powers and authority conferred upon him over banks and other moneyed corporations under the laws of this State, provided he shall not have the power to sus-pend the corporations of any such associations except in the manner pro-vided in the next succeeding section."

"Chapter 236, Section XX.

"If it shall appear to the said public examiner, from any examination made by him, or from any report of an examination made by him, or from the annual report aforesaid, that said corporation is violating its charter, or the law, or that it is conducting business in any unsafe, un-authorized, or dishonest manner, he shall, by an order under his hand and seal of office addressed to such corporation, direct conformity with the requirements of its charter and of the law. And whenever such cor-

poration shall refuse or neglect to make such reports or account as may be lawfully required, or to comply with such orders as aforesaid, or whenever it shall appear to the said examiner that it is unsafe or inexpedient for any such corporation to continue to transact business, he shall communicate the facts to the attorney-general, who shall thereupon be authorized to institute such proceeding against any such corporations as are now, or may hereafter be, provided by law in the case of insolvent corporations, or such other proceedings as the occasions may require. * * *"

Sixth. On the 14th day of July, 1890, the plaintiffs, Peck and Fly, made application to the said union for a loan of $6000 on its blanks, reciting their ownership of the 100 shares of stock aforesaid, and the payment in advance of the monthly and quarterly installments required by the by-laws, and offered as security therefor the following described real property, to wit: Parts of lots numbers five and six (5 and 6) in block No. 19 of the Inner Town of Gonzales, being 54 feet front on the square and south of the 54 feet of lot No. 6 allotted to J. H. Peck, and including the west half of lot No. 6 on the back street, being the land allotted to B. N. Peck in partition of the B. B. Peck estate, as shown on page 345 of Probate Minutes G of the records of Gonzales County, Texas, situated on St. Joseph and St. George streets, in the town of Gonzales, Gonzales County, Texas.

Section 35 of the printed rules for borrowers furnished plaintiffs by the union for their guidance in preparing papers, is as follows, to wit: "Shareholders are not liable for any debts, delinquencies, or obligations of the association."

The loan was approved by the union for the sum of $5000, and the plaintiffs consenting to accept said sum, they did afterwards, to wit, on the 1st day of August, 1890, execute their first mortgage note, payable seventy-six months after date, to said National Building and Loan and Protective Union, for the sum of $5000, with 5 per cent interest per annum and 5 per cent premium per annum from date until paid, payable monthly on or before the last Saturday of each month, principal, interest, and premium payable at the office of said union at Minneapolis, Minn., said note containing provisions for maturing the debt in case of any monthly default, and for attorney's fees. Also a clause transferring certificate No. 25,748 as collateral security for the payment of said note; that in order to further secure the payment of said note plaintiffs executed and delivered a deed of trust to John F. Elliott, of Dallas, Texas, one of the defendants herein, as trustee, upon the property described in their aforesaid application. And it is covenanted therein that the said John F. Elliott, trustee, and his successors and assigns in said trust, shall quietly and peaceably enjoy and possess said premises; and it is provided, that in case plaintiffs make any default as to the payment, terms, and conditions of said note, that said trustee and his successors are authorized to sell the aforesaid property to the highest bidder at public vendue, for cash, at the courthouse door of Gonzales, Texas, and make title to the

purchaser or purchasers; which said trust deed was duly recorded in the trust deed records of Gonzales County, Texas; and at the same time in compliance with the by-laws of the union, and at its request, Peck & Fly made and executed a written assignment of their certificate of shares to the said union, on the back thereof, as additional security for said loan, but retained the possession of the certificate herein sued upon.

Seventh. On August the 14th, 1890, plaintiffs received in New York exchange from the said union, for the note so secured, the sum of $4818.75, the difference between said sum and $5000 having been retained by the union for withdrawal installments and advance interest and premiums for three months, as provided by its by-laws. All negotiations between plaintiffs and the said union on said shares of stock and loan took place, and said certificate was delivered, and said money was received in Gonzales, Texas, and the said money was used by the plaintiffs, with other moneys of their own, in the construction of a brick business house on said mortgaged lots.

Eighth. Appellees, Peck & Fly, paid punctually on the last Saturday of each month, beginning with July, 1890, and ending with December, 1896, as follows, to wit: Monthly dues $60, quarterly and withdrawal installments $25, interest and premium $41.67, aggregating the total sum of $126.67 per month, and during the entire period $9880.26, and including $200 membership fees, $25 valuation fees, and $10 attorney's fees, on the loan the total sum of $10,115.26, and that they strictly complied with all the duties and obligations, including the payment of insurance and taxes, that they agreed to perform, and in every way carried out the contract on their part. On August 22, 1896, the defendant, the Pioneer Savings and Loan Company, addressed a letter to the appellees, which was receieved by them in due course of mail, notifying them in substance that, owing to large losses on real estate, which they had been forced to foreclose, that they would be unable to pay the par value of their certificates at their maturity, but only its book value, which they explained meant its pro rata interest in the total assets of the company, and which they said would be worth, after their September payments, $5697, and offered to satisfy their mortgage, and pay them during the month of September $613.66 on condition that they would surrender their certificates. The appellees did not accept this offer, but on the advice of their counsel, continued to pay their monthly installments up to the agreed maturity period of their certificate in compliance with their obligation. That just before the maturity of the same, and after their last payment, the appellees sent their attorney to Minneapolis to effect a settlement and payment of said debt.

That in an interview with the appellees' attorney, at Minneapolis, Minn., the appellant company, through its president, admitted that appellees had complied in full with their obligations to the company, and exhibited to him their books so showing, but stated that the directors had decided that they were only liable to them to the amount of the book value of the stock, which they claimed was at that time worth $5986, and

then and there tendered him the sum of $980 in cash, and offered to deliver up appellees' note on condition that appellees would surrender their certificates of stock for cancellation, and receipt them in full for all demands growing out of said transaction. This tender was then and there rejected by appellees, who then and there demanded the full sum of $5000 in cash, the cancellation of their debt as per the original contract, and the release of the trust deed, appellees' attorney then and there having and presenting their certificate of shares with full power to represent them, which demand was by appellant company refused. The president of the appellant company thereupon notified the appellees' attorney that if he did not accept the terms of settlement offered and tendered as aforesaid, that they would treat appellees' stock ownership as a separate and distinct transaction from their loan, and that the company would immediately notify John F. Elliott, the trustee in said deed of trust, to sell their property in Texas to satisfy appellees' note, upon which they said there was no credit save the interest, and would foreclose the same under the terms specified in said deed of trust. That the said appellant company then and there stated to appellees' attorney that upon due consideration they had determined that appellee was only a stockholder in a mutual association, and as a stockholder was only entitled to their pro rata share of the net profit earned by the company after deducting all expenses and losses, and that plaintiffs' position as borrowers and stockholders were separate and independent, and they then and there renounced their obligation to pay the face value of appellees' stock at its date of maturity in accordance with the terms of the same. That afterwards, to wit, on January 27, 1897, appellees' attorney again visited the office of the Pioneer Savings and Loan Company, in Minneapolis, Minn., and demanded of the officers of the appellant company the face value of their matured stock, and the liquidation of appellees' note and a release of their property given to secure the same, which they refused upon the grounds given at the previous interview, but again asserted that they were willing to pay the sum of $980 in full settlement of the claims of the appellees, Peck & Fly, against the appellant Pioneer Savings and Loan Company, upon condition that appellees surrender their aforesaid certificate of shares to the company for cancellation, and receipt them in full for their demands against it, and they did then and there tender to appellees' attorney the sum of $980 in payment of said demand as aforesaid, which offer and tender was by appellees' attorney then and there refused and rejected under the terms offered.

Afterwards appellees filed this suit in the District Court of Gonzales County, Texas, and obtained an injunction restraining John F. Elliott from selling the appellees' real estate in Gonzales County, to pay said note for the money borrowed by appellees from the appellant company, and at the same time obtained writs of original attachment against the appellant company to Dallas and Hopkins counties, Texas, which were on the 2d day of February, 1897, levied on the real estate of the appellant company in Dallas County, Texas, and on the 3d day of February, 1897,

levied on the real estate of the appellant company in Hopkins County, Texas.

Ninth. On April 23, 1897, at the instance of the public examiner, the State of Minnesota enacted a law, amending section 20 of chapter 131 of the General Laws of Minnesota of 1891, so as to provide for the voluntary liquidation of building and loan associations, which, in so far as it is material to this case, is as follows, to wit:

"Section 20. ⁕ ⁕ ⁕ Any corporation governed by this act may, if ordered by a majority vote of its directors, voluntarily go into liquidation, provided that the public examiner shall consent in writing thereto. Notice of such action by the directors or stockholders, and the consent of the public examiner, shall be mailed to each stockholder of such corporation, at his last recorded address; and thereupon such corporation going into such voluntary liquidation may adopt such methods and measures as may be lawful, equitable, and just for the winding up of its affairs, subject to the direction and control of the public examiner; provided, that the methods so adopted shall, as nearly as may be, conform to the original plans and objects of the corporation; provided also, that any changes in such plans or methods shall be approved by the public examiner before being so adopted by such corporation; and it is further provided, that if it shall appear to be for the best interests of such corporation, the board of directors may change the plan of loans to a definite time or times of payment, at a rate of interest not exceeding the legal contract rate per annum; or may negotiate or assign any or all of its mortgages for cash, at such times and on such terms of settlement as may appear to the best interests of such corporation.

"Any such corporation in course of liquidation shall have authority to consolidate with any other corporation, organized for the same purposes, upon such terms as shall be agreed upon and authorized by the board of directors of the respective corporations, the majority of stockholders consenting thereto, and to transfer to such consolidated corporation its entire assets subject to existing liabilities. All expenses of such liquidation, whether voluntary or otherwise, including the compensation of officers, employes, and directors, shall be paid from the funds belonging to such corporation, subject to the approval of the public examiner, in lieu of the expenses provided for in section 30 of this act. ⁕ ⁕ ⁕

"The proceedings prescribed in this section for the winding up and liquidation of the affairs of the corporation governed by this act shall be exclusive of any remedies provided by the laws of the State of Minnesota relating to general corporations.

"Section 21. This act shall take effect and be in force from and after its passage."

A special meeting of the board of directors of the Pioneer Savings and Loan Company was called and held in its office on Monday, April 26, 1897, and the following resolutions were adopted, to wit: "Resolved, that the Pioneer Savings and Loan Company does hereby go into voluntary liquidation, for the purpose of winding up its affairs, pursuant to

the laws of the State of Minnesota, and hereby requests the consent of the public examiner of Minnesota thereto." Also that on the same day the public examiner gave his consent thereto, and that since that time and now the affairs of said company have been conducted under the control and supervision of its former officers and board if directors, liquidating its obligation under the terms of the act above set out.

Tenth. Appellant company, first under the name of the National Building, Loan, and Protective Union, and subsequently under the name of the Pioneer Savings and Loan Company, governed by the same officers, has, from the 1st day of July, 1890, to the 26th day of April, 1897, been actively engaged in the business authorized by its charter and bylaws, to wit, collecting dues upon its several shares of stock, fines for the nonpayment of such dues when delinquent, forfeitures of all dues previously paid should the stockholder suffer default in the payment of dues to extend three months, the collection of interest and premiums on loans, the foreclosure of mortgages on real estate of delinquent mortgagors and forfeited borrowing stockholders, conducting litigation with its shareholders where suits have arisen, and settling with the maturing stockholders. It has acquired a large amount of real estate in several States of the United States by foreclosures and adjustments upon which they have been paying taxes and insurance, and from which it has collected rents. It has effected sales of the said real estate from time to time as it became marketable, but has made no new loans to borrowing members since July, 1891, and has neither sold nor attempted to sell any stock since January, 1892.

Eleventh. When this suit was instituted, appellant, the Pioneer Savings and Loan Company, was a "going concern" and perfectly solvent, having available assets far exceeding in value the amount of its liabilities. In reaching this conclusion we excluded from our consideration the testimony of T. F. Harwood, the admission of which is assigned as error by appellants, and considered only such testimony as was introduced without objection. We believe that appellant's testimony alone fully warrants us in concluding that the loan association was solvent when this suit was instituted, and was in the same condition when the case was tried in the court below.

*Conclusions of Law.*—First. The appellant company, notwithstanding the refusal of the District Court of Gonzales County to remove this cause to the Federal court, having procured the transcript of the record and filed it with its application and bond for removal in the Circuit Court of the United States for the Western District of Texas at San Antonio, and said court having upon due consideration determined that it had no jurisdiction of the cause and remanded it to the court where instituted, can not be heard to complain of the refusal of the trial court to grant its application for removal. The order of the Federal court remanding the cause is conclusive of this question. Tel. Co. v. Mina Luck, 91 Texas, 178; Railway v. Fitzgerald, 160 U. S., 556. Had appellant's applica-

tion for removal been granted, it would have effected nothing, for the United States court would have held it was without jurisdiction and have remanded the case, just as it did do. That court is the one to determine questions involving its jurisdiction, and its determination of such questions can not be gainsaid in State courts.

Second. The court did not err in sustaining appellee's exceptions to appellant's pleas of jurisdiction. Where a defendant pleads his privilege of being sued in the county of his residence, he should negative the existence of every state of facts under which the pleading and scope of the remedies asked would give the court jurisdiction of the cause. Boothe v. Feist, 80 Texas, 144; Raleigh v. Cook, 60 Texas, 440. Appellee's petition shows upon its face that it is brought in part to remove incumbrances upon the title to land situated in Gonzales County, Texas, and to quiet title thereto. Subdivision 14 of article 1194, Revised Statutes, expressly authorizes suits of this character to be instituted in the county in which the land or a part thereof lies. No allegation was made in the plea of abatement that the land, from which the incumbrance and cloud upon the title was sought to be removed, did not lie in the county of Gonzales. Nor could such an averment have been truthfully made. The contention of appellant that jurisdiction of the suit could not be maintained in the District Court of Gonzales County, for the reason that the parties to the action had contracted that any suit upon the stock certificate should be brought within six months after the right of action had accrued, and only in the county of Hennepin, State of Minnesota, is untenable. The suit was not brought to recover upon the certificate alone, but to remove an incumbrance and cloud upon the title to land situated in Gonzales County, and to restrain the sale of such lands under the power given in the deed of trust recited in our conclusions of fact. To determine whether such incumbrance and cloud rested upon the land and that the threatened sale should be restrained, it was necessary to ascertain whether such mortgage had been discharged. This could only be done by finding out whether the appellees had performed their contract embodied in the certificate. If they had, the mortgage debt was fully discharged, and they were entitled to have the mortgage canceled as a cloud upon their title, and the sale of the premises restrained, and to recover any balance that might be due them on the contract. It would have been impossible for the appellees to have obtained the relief sought in any of the courts of the county of Hennepin, State of Minnesota, for no court of Minnesota has jurisdiction to remove an incumbrance or cloud from title to land in the State of Texas, or to enjoin the sale thereof. As the District Court of Gonzales County had jurisdiction of appellee's action to cancel the mortgage, and, in the exercise of such jurisdiction, to inquire whether the respective parties had performed their part of the contract, its jurisdiction, as an incident to the suit for cancellation, obtained to fully and finally adjudicate all the matters at issue between the parties incident to such contract.

Third. In replication to appellant's third plea in abatement the appel-

lees averred: "That some six months before the expiration of the maturity of said stock the defendant company notified plaintiffs that it would not pay them the full amount of the face value of its stock at maturity, but only a portion of the various sums of money paid by them to the company." The overruling of exceptions to this pleading is assigned by appellants as error. The trial court, in its conclusions of law, states its reason for overruling the exceptions in the following language: "When defendant [appellant] on the 27th day of January, 1897, ignored the contract between it and the plaintiffs [appellees] and tendered them $980 in full settlement of their claim, upon condition that the latter surrender their certificate of shares to the company for cancellation, and receipt the company in full for their demands against it, the defendant distinctly disavowed its intention ever to fulfill its contract according to its plain terms, and is estopped from claiming that it was entitled to ninety days after maturity of the shares in which to settle, and can not now claim that the suit was prematurely brought, especially when it continues to repudiate its contract." The reason thus stated, in which we concur, fully sustains the ruling of the trial court upon the exceptions. Beach on Modern Law of Contracts, sec. 409; Insurance Co. v. Jacobs, 56 Texas, 372; Insurance Co. v. Josey, 6 Texas Civ. App., 293; Insurance Co. v. Shrader, 11 Texas Civ. App., 259. Besides, as this suit was brought by attachment, and judgment was not rendered until January, 1898, more than twelve months after the obligation was due; and as in its answer, appellant admits that appellees did all they contracted to do, it is immaterial whether the suit was brought before or after the ninety days had expired. Gimble v. Gomprecht, 89 Texas, 497; Tootle v. Alexander, 13 Texas Civ. App., 617.

Fourth. The appellant's third special exception to appellees' petition is as follows: "Defendant specially excepts to that portion of the plaintiff's petition in which it charges merely upon information and belief that the defendant is about to procure a sale of plaintiff's property to pay the debt secured by deed of trust, because an allegation merely upon information and belief is not sufficient to authorize the relief sought." This exception was first presented on the trial upon the merits, and was then overruled. This ruling is assigned as error. The allegation in the petition to which the exception is directed is as follows: "Plaintiff is informed, and on information charges, that defendant company is about to procure the sale of said property to pay said debt, settled as aforesaid." The affidavit for the injunction is, "that the facts and matters set forth in the foregoing petition are true." The question as to whether the temporary injunction should have been granted on this allegation and affidavit need not be passed upon, as there was no motion to dissolve it before a final hearing of the cause. Upon the trial the court having found that "the defendant having threatened, in case plaintiffs would not settle on the terms proposed by the company, that it would treat the plaintiff's stock ownership as a separate and distinct transaction from the loan, and that the company would immediately notify the trustee to

sell plaintiff's property in Gonzales County, upon which the mortgage lien existed, to satisfy the loan," its conclusion that the injunction should be perpetuated necessarily followed. And, the injunction being prayed for as part of the relief, under such findings it could make no difference whether the affidavit was sufficient to warrant a temporary writ or not, for upon the final hearing of the cause appellees were entitled to a perpetual injunction restraining the threatened sale.

Fifth. Appellant's fourth special exception to appellees' petition is, "that it does not tender the certificate of stock held by them for cancellation." Appellants, as their proposition under the assignment of error which complains of the court's failure to sustain this exception, assert that "to authorize the cancellation of a contract the party seeking it must tender up the benefits that he has derived therefrom." The proposition is an assertion of a well-established principle of equity, but one that has no application whatever to this case. This action is not to cancel a contract, but to enforce by one, who has fully performed his part of the agreement, its performance by the other party. It can not be seriously contended by appellant's counsel that a party who has kept and performed his contract to the letter, must surrender for cancellation the evidence of the liability to him of the other party to the agreement when he comes into a court with clean hands and asks that equity be done him. The cancellation of a mortgage is asked because the debt it was given to secure has been discharged; must, before this relief can be granted, the appellees surrender for cancellation appellant's obligation to pay them $5000? No.

Sixth. What we have said in our fourth conclusion of law applies to the assignment of error which complains of the court's action in overruling the special exception of John F. Elliott to plaintiff's petition.

Seventh. T. F. Harwood, over the objections of the defendant, which objections will be specifically stated hereinafter, testified before the court that, as the attorney of the plaintiffs, he had gone to Minneapolis, Minn., on the 19th day of December, 1896, for the purpose of interviewing the officers of the defendant company in regard to the plaintiff's claim, and if possible collecting the same; that while in Minneapolis he investigated the condition of defendant company as to solvency; that he investigated and read the files in the Perkins case in the courts of St. Paul, also the Angell case, both being suits against the company; that he had also interviewed the officers of the company itself; that he had examined the records of the attorney general's office of the State of Minnesota, and also the records of the office of the public examiner of the said State; that he had also had conversations with Asa H. Briggs, an attorney of St. Paul, and that he had seen the officers of the said company in possession of its books and papers, and knew that its assets were not in the hands of a receiver; that he also interviewed the assistant attorney general, public examiner, and several prominent business men of Minneapolis, to whom he was introduced by Mr. Briggs, the local attorney of

plaintiffs; that he did not personally know what were the assets and liabilities of the defendant company, nor which exceeded the other, except from the statements of the company seen by him at the public examiner's office and elsewhere. Whereupon the plaintiffs asked said T. F. Harwood whether, in his opinion, from the facts that he discovered, and by reason of his foregoing testimony the defendant company was at that time a solvent, going concern; to which question and the proposed answer the defendant company objected, (1) because it was not such a matter as a witness could give an opinion about; (2) because it was merely the conclusion of the witness from facts, circumstances, and conversations that were not detailed, and the court could form a conclusion as to whether the defendant company was a solvent going concern or not, if the facts discovered by the witness were not detailed to the court; (3) because the public examiner's record and other official records were the best evidence of what they contained, and defendant was entitled to their production before any conclusion could be drawn therefrom; (4) because said testimony was hearsay." The admission of this testimony over such objections is assigned as error.

Professor Greenleaf, in his work on Evidence, section 93, says: "A further relaxation of the rule" (referring to that which requires the production of the best evidence of which the case, in its nature, is susceptible) "has been admitted, where the evidence is the result of voluminous facts, or of the inspection of many books and papers, the examination of which could not conveniently take place in court." * * * And, further, in the illustration of holdings relaxing the rule, he says: "So, also, a witness who has inspected the accounts of the parties, though he may not give evidence of their particular contents, may be allowed to speak to the general balance, without producing the accounts. And when the question is upon the solvency of a party at a particular time, the general result of an examination of his books and securities may be stated in like manner." It is upon the authority of the above quotation that appellees contend that the testimony of Mr. Harwood was admissible. We do not think their position can be maintained by it, or any other principle of evidence. Here the witness from records, books, and interviews with various parties is permitted to give his opinion, from facts he discovered, that appellant company was a solvent, going concern. The "result of his examination" is not given, no facts he discovered disclosed,—only his opinion is stated. His opinion should not have been received as evidence. Brandred v. Machine Co., 4 N. J. Eq., 295. "Facts, and not opinions, are listened to by judicial tribunals. The jury are called upon to form their conclusions upon the issues involved from the facts before them, and not upon opinions which may be entertained upon the subject in controversy, save in exceptional cases" (State v. Myers, 54 Kansas, 215, 38 Pacific Reporter, 298), and this is not one of them. But as this case was tried by the court without a jury, and the uncontroverted evidence, exclusive of the testimony complained of, shows that appellant corporation was solvent and a going concern, the admission of such testi-

mony furnishes no ground for reversal of the judgment. Dailey v. Starr, 26 Texas, 526; Railway v. Wilson, 4 Texas Civ. App., 178; Crouch v. Johnson, 7 Texas Civ. App., 438.

Eighth. The portion of the answer of the witness, Emerson Cole, to direct interrogatory 13, which was excluded by the court upon motion of appellees, was not responsive to the question asked. And the objection made, on that ground, to its being read in evidence, was properly sustained. The court in striking out a part of the answer, acted in obedience to article 2291, Revised Statutes, which provides, that "If any deposition shall contain any testimony not pertinent to the direct and cross-interrogatories propounded, such matter shall be deemed surplusage, and may be stricken out by the court upon objection thereto." Our appellate tribunals have always sustained the trial courts in enforcing this rule. Hirams v. Coit, Dall., 449; Lee v. Stowe, 57 Texas, 444; Railway v. Crowder, 71 Texas, 417; Parker v. Chancellor, 78 Texas, 527; Crosson v. Dwyer, 9 Texas Civ. App., 482.

Ninth. In answer to the fifteenth direct interrogatory the same witness said: "I have never had any other conversation or agreement with any one representing plaintiffs or agents or attorneys in regard to the matters in controversy in this suit except as I have herein stated." After this answer was read appellants' counsel again offered to read in evidence the portion of the preceding answer, which had been stricken out, and has assigned the action of the court in refusing to allow him to do so as error. The excluded portion of the answer to direct interrogatory 13 is not responsive to the fifteenth interrogatory either. Besides we do not think that it is pertinent to any issue made by the pleadings in this case.

Tenth. All of the answer of the witness Cole to the twenty-second direct interrogatory, except his conclusions derived from certain exhibits referred to by him in the answer, which exhibits had already been introduced, was admitted in evidence. It was for the trial judge, sitting as a jury, to form conclusions from the facts shown by the exhibits, and not the province of the witness. Besides an analysis of the questions embodied in the interrogatory and of the answers, shows that the witness either failed to answer or evaded answering every question, except the two of which the answers were used in evidence.

Eleventh. Upon the trial the appellants offered to read the twenty-ninth interrogatory and the answer thereto in the deposition of Emerson Cole, which are as follows:

"Twenty-ninth interrogatory: 'Have you not testified heretofore that building and loan associations, so long as they have their shareholders merely as creditors, can not become insolvent? Suppose, however, that the association or partnership, as you may term it, is not able to comply with its agreement to pay at a specified time the amount paid in by the certificate holder in accordance with the certificate with interest thereon from the date of payment? Have you meant to say that said association was insolvent?' Answer to twenty-ninth interrogatory: 'It has been my understanding of the law that so long as building associations do nothing

except loan upon their stock to their own stockholders, they can not become insolvent in the strictest sense of the word. The relation of the members to each other being that of partners, and so believing, I have heretofore testified substantially to that effect. I have never meant to say otherwise with regard to this association. I have always stated the facts regarding the condition of this association as I found them to be. It is entirely probable that my understanding of the legal status of the company upon those facts was erroneous. The facts, however, remain the same, and if those facts constitute insolvency, then this association was and is insolvent. I am not aware that I have ever otherwise stated.' To which interrogatory and answer the plaintiffs objected by written motion filed in due season as follows: 'That the same seeks to elicit a conclusion and opinion from the witness in law, when the same should only ask for facts upon which the court may draw the legal opinion, and because the question is argumentative, and could at best only elicit an opinion from the witness, and the court sustained the objection and struck out the said interrogatory and answer, to which defendant then and there objected," etc.

The court did not err in sustaining the objections and in striking out the interrogatory and answer. As what the witness may have testified theretofore was not introduced in evidence by the appellees, no explanation of it was required. The witness' generosity in stating his understanding of the law might have been dispensed with. As it was incumbent upon the court below to try the case according to its understanding of the law, it was immaterial what may have been the understanding of Mr. Cole upon the subject.

Twelfth. The thirtieth interrogatory to Mr. Cole and his answer thereto are like unto those last considered, and upon similar objections, were properly stricken out.

Thirteenth. By the thirty-second interrogatory to Emerson Cole, this witness was asked (1) to give an estimate substantially and specifically of the business of the association from the time it ceased to do active business in the way of making loans up to the day the interrogatory was propounded, and the motives that actuated its officers in so doing business; (2) what had been the character of its business since it ceased to make loans. In answer to the interrogatory no estimate of the business of the association was stated. While the character of its business was by the answer stated in a desultory manner, its nature and character since 1891 was fully shown by other testimony. Therefore appellants were not prejudiced by the court's excluding that part of the answer. The motive that actuated the officers in conducting the business in the manner they did was foreign to any issue in the case.

Fourteenth. The facts found by the trial court are established by the evidence. Those requested by appellants to be found, so far as are material to the issue, were not proven and are at variance with those found by the court.

Fifteenth. The court having, under the evidence, found as a fact that at

the time this suit was filed and appellees' writ of attachment was levied, the appellant company was solvent, in the possession of its assets, conducting its business as a going concern; and, as such, had not ceased to carry on its business in the general course of trade, it did not err in rendering judgment against it in favor of appellees. It has been held, even where a corporation is insolvent and contemplates making a general assignment, and whose liabilities largely exceed its assets, yet when it has not ceased to carry on business in the general course of trade, its creditors may obtain preferences by attachment. Bank v. Mfg. Co., 39 S. W. Rep., 955; Moon Bros. v. Imp. Co., 13 Texas Civ. App., 103; Shoe Co. v. Thompson, 35 S. W. Rep., 473; Electric Belt Line v. Ide, 40 S. W. Rep., 40; A. B. Frank Co. v. Berwind, 1 Jour. of App., 19. In the case last cited, under this principle an attachment in favor of a director of an insolvent corporation, which had not ceased to do business, was upheld by this court, and an application for writ of error by the Supreme Court denied.

Sixteenth. The contract between the parties embodied in the certificate of shares was a simple agreement on the part of appellant company to pay appellees $10,000 on January 1, 1897, upon the sole condition that they pay the several sums of money at the times and in the manner stipulated in the contract. The contract was so construed by the district court. But the company contended that the contract was nothing more than a subscription of shares of capital stock of a mutual benefit society, and that their obligation to pay the same was with the express reservation that at the expiration of the agreed maturity period, the company had earned enough to pay all its obligations on the same basis, and, if not, that it should only pay on said shares the pro rata earnings of the company. If the contract is subject to a different construction from the one placed upon it by the court, then by repeated decisions of our courts the letter referred to in our third conclusion of fact was admissible to show the circumstances under which the contract was entered into, and the construction placed upon it by appellant and accepted by appellees when the contract was executed. By this letter the company construed the contract as an express warranty upon its part to pay the shares at their face value in six and one-half years from their date. While we think that the contract admits of no other construction than that placed upon it by the court, yet if it does, it would seem upon principle and authority that the appellees having been induced to enter into the contract upon the truth of the representations contained in said letter, the appellant company would be estopped from insisting upon any other construction.

Seventeenth. The contention of appellant company that it is a mutual benefit association is refuted by the thirteenth condition upon which the obligation sued on was issued. The condition is as follows: "The holder of this certificate shall have no claim or interest in the affairs, assets, or funds of the union, nor control over them, except as specifically set forth in the certificate or in the by-laws, and he or she assumes no further liability of any kind whatever except as stated in this certificate and in the

by-laws." The only interest given the shareholder in the by-laws and cer-
tificate is the right to vote in person or by proxy at stockholders' meet-
ings, and the right to collect $100 per share at the expiration of six and
one-half years. And the only liability specified in either the certificate
or by-laws is the payment of monthly or quarterly dues during the stip-
ulated contract period under penalty of fines and forfeitures. Thus it is
shown that the obligations and liabilities of the company and its share-
holders are separate and distinct, and as between them are only such as
arise from the contract. Each is to perform under the contract his or
its part of the agreement. If one performs its agreement, and the other
does not, he is liable for its nonperformance. The appellees have fully
performed theirs; the appellant has not, and the judgment appealed from
simply requires it to do what it obligated itself to do by its contract. The
contract embodied in the certificate is like the one in Savings and Loan
Co. v. Pancoast, 17 Texas Civil Appeals, 312, and the construction given
it by the trial court is the same as was placed upon it by us in the
case referred to, and our construction was upheld by the Supreme Court
by its denying an application for writ of error in that case.

We find no error in the judgment appealed from, and it is affirmed.

*Affirmed.*

FLY, Associate Justice, did not sit in this case.

Writ of error refused.