## HOWARD v. WATERMAN LUMBER & SUPPLY CO. et al.

(Court of Civil Appeals of Texas. Jan. 11, 1911. Rehearing Denied Feb. 9, 1911.)

1. TRIAL (§ 139*)—DIRECTION OF VERDICT.

Where the evidence most favorable to plaintiff is sufficient to raise a question for the jury, it is error to direct a verdict for the defendant.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 332–341; Dec. Dig. § 139.*]

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

2. MASTER AND SERVANT (§§ 286, 289*)—INJURY TO SERVANT—RAILROADS—NEGLIGENCE—CONTRIBUTORY NEGLIGENCE.

In an action by a track surfacer for injuries at a switch, caused by collision of a "shay" engine and log car on which plaintiff was riding, evidence *held* to make the negligence of defendant and the contributory negligence of the plaintiff questions for the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1010–1050, 1089–1132; Dec. Dig. §§ 286, 289.*]

3. RAILROADS (§ 358*)—PERSONS ON TRACK—INJURY — CARE REQUIRED FROM TRAIN CREW.

It is the duty of operatives of a railroad train to use ordinary care to discover persons who have a right to be on the track, and failure so to do is negligence which entitles one injured thereby, if not himself negligent, to recover damages.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1236, 1237; Dec. Dig. § 358.*]

4. MASTER AND SERVANT (§ 288*)—INJURY TO SERVANT—RAILROADS—NEGLIGENCE — CONTRIBUTORY NEGLIGENCE.

In an action by a track surfacer for injuries at a switch caused by collision of a "shay" engine and log car on which plaintiff was riding, *held* that the question of assumption of risk was for the jury on the evidence.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1068–1088; Dec. Dig. § 288.*]

5. WORDS AND PHRASES—"DINKEY ENGINE."

A "dinkey engine" is a locomotive of regular pattern, but small size.

Appeal from District Court, Shelby County; James I. Perkins, Judge.

Action by Charles Howard, by next friend, etc., against the Waterman Lumber & Supply Company and another. From a judgment on a directed verdict for defendants, plaintiff appeals. Reversed and remanded.

S. W. Blount and S. M. Adams, for appellant. Davis & Davis and Young & Stinchcomb, for appellees.

McMEANS, J. Charles Howard, a minor, by his father as next friend, brought this suit against the Waterman Lumber & Supply Company and the Texas & Gulf Railway Company for damages for personal injuries alleged to have been sustained by him. Plaintiff afterwards dismissed his suit against the Railway Company, leaving the Lumber & Supply Company as sole defendant. The case was tried by the court with the assistance of a jury; and after all the testimony had been introduced the court instructed the jury to return a verdict for the defendant, which was done, and thereupon a judgment was entered in defendant's favor, from which the plaintiff has prosecuted this appeal.

Appellant's only assignment of error complains of the action of the court in instructing a verdict against him, and this assignment should be sustained if the evidence was sufficient to require the submission of the issues involved to the jury. This requires a discussion of the testimony.

The following facts are undisputed: Upon the date plaintiff alleged he was hurt, and for nine days prior thereto, he was in the employment of defendant in the capacity of track surfacer. Defendant operated two sawmills, one located at Timpson and the other at Waterman. These were about 15 miles apart. The Texas & Gulf Railway ran between these places. The defendant owned and operated a line of railway which connected with the track of the Texas & Gulf Railway about one mile north of Waterman, and ran thence eastwardly into a pine forest from which defendant procured logs to be manufactured into lumber at its mills. Nearly all of defendant's employés who were engaged in surfacing the track of its railroad, and in loading logs on cars to be transported to the mills, lived in Timpson, and it was a part of their contract that they were to be carried to their places of work from Timpson over the Texas & Gulf Railroad to its junction with defendant's road, and thence over defendant's road to their several places of work. In being so transported these employés rode on log cars, which we gather from the testimony were not like ordinary flat cars, but consisted of two sets of trucks connected by a long coupling pole, and over each set of trucks was what is called a bumper, upon which the logs rested, these bumpers resembling the bolsters of the ordinary log wagon. The cars having no flooring, the only place the employés could sit while riding was upon the bumpers. The cars which carried plaintiff and the other employés to their work on the morning plaintiff claimed to have been hurt were moved by a dinkey engine, which is a locomotive of regular pattern but small size, from Timpson to the junction of plaintiff's railroad. There were six cars in the train, three being pushed in front of the locomotive and three pulled behind it. When the train reached the junction the dinkey set some, if not all, of these cars on the defendant's railroad, among those being so placed being the one upon which plaintiff was riding, and this car was left about 75 or 100 yards from the switch that connected the roads, and was the car nearest the switch. Plaintiff was sitting on the bumper of the car that was nearest the switch. After setting the cars on this track the dinkey was run onto the track of the Texas & Gulf Railway, where it was to remain, and where it customarily remained, until defendant's engine which carried the cars to the forest or "to the front" came from Waterman, bringing with it other cars which had previously been hauled to Waterman, loaded with logs for the defendant's mill at that place. This locomotive was called a "shay," and was operated by a system of cogs, and in running made a noise different from that of the dinkey. The dinkey

usually reached the switch first and did so on the morning in question. After the cars had been run·by the dinkey on defendant's track, the employés, numbering from 8 to 12, including plaintiff, remained upon them, sitting in the same places in which they were when the switch was reached. After about 25 minutes the shay left Waterman coming toward the switch, sounding its whistle just as it left, and this was heard by plaintiff. A little later when the shay reached a point about 250 or 300 yards from the switch plaintiff looked and saw the shay coming on the track of the Texas & Gulf Railway, and it was running fast at that time, and after that he did not look at or pay any further attention to it.· The shay after slowing up came in the switch pushing a car or cars ahead of it, and began to increase its speed, and, without decreasing its speed but ever increasing it, ran against the car upon which plaintiff was sitting with such force as to derail the car and throw plaintiff to the ground in front of the wheels so that the car being set in motion by force of ˈthe impact ran upon and injured him. Plaintiff heard the noise made by the moving shay from the time he saw it up to the moment of the collision but did not look·in that direction. The cars upon which he and the other employés were, were placed on the switch to be pushed to the front by the shay, and it was usual, and in fact expected, that defendant's servants would couple the shay or the cars pushed by it to the cars in question before the movement toward the forest was begun. The coupling is made by the use of a chain and pin and is effected by an employé, usually the brakeman, inserting the pin in the link or chain while standing upon the ground, the cars coming together slowly to allow him to do this, but if the brakeman happened to be upon the bumper, the place where plaintiff was, then the coupling is made by him while occupying that position. The facts thus far stated we believe are undisputed. Plaintiff testified that he was sitting with his face to the front, that he saw the shay coming when it had reached a point about 250 or 300 yards from the switch, and that he did not thereafter look, but that he expected·it to slow down at the switch and to approach the car upon which he was riding slowly as was done every morning and as was usual; that he heard the shay coming; that he had his back to it and did not look around again; that he heard it puffing and knew it was coming, but did not know how close it was; that if the whistle had been sounded or the bell rung he would have looked; that he did not know the shay was coming then; that the shay had not been running into the cars every morning and it did not generally run into the switch fast but would slow up and move in on the switch; that when the switch was thrown they always slowed up to come in and that he relied on them slowing up that morning, but that he did not look to see if that was done; that he did not know the shay was as close as it was. "It generally slowed up every morning and I thought it was going to do that that morning. I heard it coming, but did not know how fast it was coming. I did not look around to see how fast or slow it was coming. I did not think it was going to run into the car." He could have seen the·shay at all times from the time it entered the switch until it reached the car he was on had he looked. He further testified that the shay would stop at the switch for the switch to be opened, or if it was already open the shay would slow up and couple on to the cars and then carry them on out to the work. "I would remain on the car every morning when we would come from Timpson and they would set us out there, and when the shay would come from Waterman and connect on to us I would stay on the car while they were making the coupling. In switching the cars I never got off of them."

Foster Seawell, another employé of defendant, was riding on the same bumper with the plaintiff and was sitting by him just before the collision. He testified:

"I had been working for that company four months and I was never ordered by any one not to stay on those cars while being connected with others. I never had any orders from anybody not to stay on those cars. That morning that Charley was hurt I was on the car with him. I heard the shay that morning down the road a piece, but was not paying any attention. I noticed it was coming to take us on out; before that morning when the shay would come in on the switch I would remain on the log cars while they were making connections. They had a caboose besides the log cars to ride in, but they didn't take it all the time; they didn't have a caboose that morning. A good while before that they carried it, but along about that time they didn't carry it at all. When that shay would come from the mill and couple on to those cars they would not wait for the men to get on, they would pull out, and some of the men would catch the train and some would walk. On the morning that Charley was hurt I was on the car with Charley. I heard the shay coming before it got there that morning. I was on the car when it got struck that morning—about the time it struck I left it. I remember a good many were on the car at the time and there were some knocked off. There was another boy on that car that was knocked off, he was an Anderson, but I disremember what his first name was. Charley was sitting on that bumper to my back and his side was to me. I saw the shay come in that morning but paid it but little attention, knowing it was coming to take us out, and the time was coming for me to go to work, and I never paid

it much more attention. The first that attracted my attention I looked around and saw it was coming too fast to slow up in time for them to couple, and I kept sitting there watching it kinder on the sly, and I saw they were going to do something, and I lit off about the time they struck, and I gave a jump about the right time or I would have been tumbled off and fastened there too. Charley fell on his face—on his face like I think; he fell to the right side. Charley was not facing towards the switch, he was facing out towards the front. I didn't halloe at Charley when I jumped. I had been remaining on the cars all the time when the shay would come up and couple on to them. The shay didn't come in on the switch that morning at the usual speed. They had not been coming in there that way every morning at all. I had been working for the railroad for some time. I don't know exactly the speed that train was running that morning when I looked around and jumped off, but it was coming faster than it had any business to come and couple on. I couldn't tell exactly how fast it was coming, but it was coming a heap too fast. I jumped because I saw they were going to run into the car I was on. When the shay run around the curve and bumped into the car that Charley and I were sitting on I didn't hear the whistle blow or the bell ring. There was no warning given by the train that backed in there to my remembrance. These hands that were on those cars that didn't jump fell off some way; they saved themselves all right. I didn't have any warning that I must not get on the cars while being switched. I didn't have any warning from any one. I have caught on the cars while they were being switched, and would stay on them while they would be switching, and there was no warning given to me at all not to be on the cars while they were being switched. When they ran into that car that Charley and I were on they knocked it off of the track; it knocked one truck off to my remembrance, and, of course, it might have been more.

"The train slowed up just as it come in the switch. I don't remember whether it slowed up for the switch to be thrown or not, and it come on in and got faster, and I looked back to my side, and I saw they were coming on it to tear up the devil or something and I jumped, and just about the time I jumped it hit. When the train commenced coming in the switch it commenced going fast, it slowed up just before it got to the switch but I don't remember whether it stopped or slowed up for some one to throw the switch or not, but when it started in on the switch it started at full speed. In coupling the cars they had not always been running into them to couple them, they always slowed up and coupled them. When they slow up and couple they don't always stop. Some-

times they would slow up and couple and highball on out to the front. When they coupled them they had to slow up and couple, but they didn't tarry. They never coupled and not stop; they couldn't exactly do that. They always had to stop just a little. The switchman can couple them pretty fast, and they just ease it right on off, and sometimes men would get left. I have gotten left myself. I don't remember exactly the dates that I got left, but I got left once or twice, but it was not exactly at the main line, but I got left out on the tram. I have gotten left because I was not on the car at the time they coupled. I remember looking around at it (the shay). It was just slowing up then. I don't remember whether they were slowing up for the switch then or not, but I remember it slowed up, and when they come around they had a good piece to come, and they kept getting faster and faster, and about two feet before they struck I jumped. It seems about the time I jumped they struck. I noticed just before they come on the switch or as they come on the switch they slowed up some, and then from the switch it kept getting faster and faster, and kept on getting that way until it struck the car. I heard it coming on back. I don't know what to call it, but anyway I heard it coming back, and was not paying it enough attention to notice it like I ought to, and then I looked back and I didn't want to stay there. My heart failed on me, and my decision was the best, too.

"It had been some time since they had carried the caboose out on that train according to my remembrance. Not knowing how long since they had carried the caboose out I am afraid to say, but I know they used to carry me backwards and forwards in the caboose. I don't know whether it has been a month since they had used the caboose or not. I am quite sure it has been over ten days since they had carried the caboose. Those cars have a link at each end kinder like the link in a trace chain, and they use a coupling pin to couple those cars together. Sometimes when a man understands it they don't have to stop still to couple the cars, but the biggest portion of the time they do stop to couple them. The man that couples the cars is a man that is working on the train, and goes out with the car. The man that couples the cars always gets on, except sometimes a man is sitting on the car, and when the car runs up he will put the pin in. Ordinarily the man that couples the cars is out on the ground, and when the car goes up he couples them together, and then gets on the car after he does that. After I saw the train coming I didn't pay it any more attention hardly until it got right up to me, and then I looked back, and saw it was coming in there too swift for me to sit there, and I jumped. If I had been paying it attention I would have gotten off before I did I

suppose, it coming in as swift as it was, and I was talking to some of the boys and remember looking back once and seeing it, and then I looked back again and saw it was coming so swift, and I saw it was my go, and I went. If I had been looking and listening I suppose I could have told how fast it was coming, but I was paying attention to other things. I was doing that morning what I had been doing other mornings—sitting there waiting to go out to work. They didn't offer me any other cars except the ordinary log cars to carry me out. In coupling those cars, when a man has a link in his hand, why they have to stop, but when the link is in the car and all he has to do is to drop the pin they kinder hold the link in one hand and ease it in the drawhead and drop the pin down, and they don't tarry."

There was testimony to the effect that just before the collision defendant's foreman shouted a warning to the employés on the cars and commanded them to get off, but plaintiff and the witness Seawell testified that if any such warning or command was given they did not hear it.

The undisputed testimony shows that the engineer of the shay did not discover the cars on the track ahead of him because of wood being piled up on the tender in such a way as to obscure his view and supposed the track was clear, and the fireman did not see the cars because he was at that time putting fuel in the engine. It seems the first they knew of the cars being on the track was when the collision took place. There was testimony which was contradictory in some particulars of that of the plaintiff and Seawell, but we are not concerned with that in reaching a conclusion as to whether the court should have instructed a verdict. We have endeavored to set out the evidence that was most favorable to the plaintiff, and if that was sufficient to require a submission of the issues involved to the jury it would follow that the court was in error in directing a verdict against him. The trial court after hearing the evidence must have concluded that the testimony conclusively established one of three defenses, viz.: That no negligence on the part of defendant was shown, or, if it was, that under the evidence plaintiff was guilty of contributory negligence as a matter of law, or that his injuries resulted from risks which he had assumed. Can it be said that the evidence did not raise the issue of the negligence of defendant's servants operating the shay in running into the car upon which plaintiff was sitting and injuring him? It has been shown that the engine was observable by persons upon the cars. It was daylight. It had at all times been the custom to place cars brought down by the dinkey on the defendant's track to be there coupled to the shay and carried to the woods, and the operatives of the shay were bound to know of this custom. It was also the custom, as shown by the testimony

quoted, for the employés coming from Timpson to remain on such cars when they were being coupled to the shay, and the operatives were bound to know this. Yet the only excuse offered by the engineer for not observing the cars in front of him was that as he had coupled onto some cars just before entering the switch he thought that these were all that were to be carried out to the woods, and that he started out with them, and that the wood on the tender obscured the cars on the track ahead of him from his view. The fireman said he was engaged in firing the engine and for this reason he did not see the cars. This may or may not have been sufficient to relieve them of negligence, for not seeing the cars and for running into them, but that was a question for the jury to determine under all the facts and circumstances in evidence. It is well-settled law in this state that it is the duty of the operatives of a railway train to use ordinary care to discover persons who have a right to be upon the track, and a failure to use such care would be such negligence as to entitle a person who was not himself also guilty of negligence to recover for injuries received in consequence thereof. Railway v. Watkins, 88 Tex. 20, 29 S. W. 232; Railway v. Eason, 35 S. W. 210; Railway v. Phillips, 37 S. W. 620; Railway v. Crosnoe, 72 Tex. 83, 10 S. W. 342; Railway v. Hewitt, 67 Tex. 479, 3 S. W. 705, 60 Am. Rep. 32. We do not think that the evidence was such as to justify the court in reaching a conclusion that the employés of defendant were not guilty of negligence, as a matter of law, in the operation of the shay at the time in question. Can it be said, then, that the evidence on the issue of plaintiff's contributory negligence was so conclusive that ordinary minds could not differ as to the conclusions to be drawn from it? If not, then it was error to instruct a verdict in so far as the issue of contributory negligence is concerned.

The cars were left on defendant's tracks for the purpose of being carried to the woods by the shay, and to do this it was necessary that the cars and shay be coupled. Plaintiff during the time of his services always remained on the car while the coupling was being effected, and this seems to have been the practice of all the employés who were carried to their work on the cars. To effect the coupling it was necessary that the shay move slowly against the car, and there is nothing in the record to indicate that a coupling made in the usual and ordinary way would produce such a jar as to endanger the employés on the cars, or to create in their minds any apprehension of danger from this source. Plaintiff believed that the coupling would be made carefully and in the usual way, as it had been done every morning during the time of his service, and as the witness Seawell said it was always done; and he had the right to rely upon the assumption that those in charge of the

train would exercise ordinary care in this regard, and in the absence of an actual knowledge upon his part that such care would not be exercised he would not be guilty of contributory negligence in indulging this presumption. He testified that he did not see the shay as it approached and did not know of the speed. He had no reason to anticipate that the engineer would fail to see the cars on the track ahead of him or that the engineer would fail to exercise proper care in making the coupling. Certainly he could not be required to anticipate, under the circumstances proven, that the engineer would run down upon the car with such speed as not to give those on the cars time to get off and with such violence as to throw the car off the track. We think the evidence was sufficient to require the case to go to the jury on the issue of plaintiff's contributory negligence.

The last question to be determined is whether the evidence established that plaintiff's injuries resulted from risks which had been assumed by him. As before shown, the evidence was sufficient, we think, to raise the issue of negligence of the engineer of the shay in causing the collision in which plaintiff was hurt. This, under the facts, was a question for the jury. Risks of injuries due to the negligence of the engineer were not among those assumed by plaintiff under the facts of this case. It follows that if plaintiff's injuries were the result of the negligence of the engineer of the shay, it was for the jury to pass upon the issue of assumed risks and the court should not have taken this issue from them by the peremptory instruction.

We think that the case was one which called for a general charge submitting the issues involved to the jury, and that the court erred in giving the peremptory instruction complained of.

The judgment of the court below is reversed and the cause remanded for another trial.

Reversed and remanded.