No. 6117.

MISSOURI PACIFIC RAILWAY COMPANY *v.* JOSEPHINE IVY ET AL.

1. HAND WITH CATTLE SHIPPED IS A PASSENGER—FACTS CONTRA STIPU-LATIONS.—Under a contract with a railway company for the shipment of cattle, stipulating that the owner should send a hand upon the train charged with looking after the cattle, with a further stipulation that such employe of the owner of the cattle was an employe of the railway company, and that as such he assumed the risks of an employe. The hand in charge of the cattle was killed in a collision upon the train. Suit for damages by his widow, children and father. *Held:*

(1) That the facts recited placed the hand in the employ of the owner of the cattle.

(2) That the contractory recital did not alter the facts.

(3) That, as a common carrier can not limit its liability by express contract, it can not be done upon false or counterfeited relations.

(4) Such employe in charge of the cattle was a passenger for hire, and was entitled to the care due to any other passenger upon a freight train; and

(5) The railroad company was liable for its own negligence, or the negligence of its servants, resulting in personal injury, and to his wife, children and father, if his death was caused by the gross negligence of the servants of the railroad company.

2. RES GESTÆ.—After a railroad disaster, the conversations of bystanders and declarations by the servants of the railroad company, narrating the cause and circumstances of the disaster and made within an hour or two after the wreck, are not res gestæ and should have been excluded.

3. PRACTICE—OBJECTIONS TO ANSWER TO INTERROGATORY.—The ninth cross interrogatory to witness was as follows: "Could Ivy, by any act or effort on his part, have done anything that would have prevented the collision of the trains?" The answer of witness was: "He could not have prevented the collision, but he had plenty of time to get out of the way of it. When I left the caboose I got some torpedoes and told him I was going back to stop the second section of the train.' To the reading of all of said answer but the words, "He could not have prevented the collision," plaintiffs objected, because the same was not in response to the interrogatory. *Held*, error to sustain the objection—the objection not having been in writing and notice to defendant before the trial.

APPEAL from Bell. Tried below before the Hon. W. A. Blackburn.

This suit was commenced in the district court of Bell county, August 14, 1885, by Josephine Ivy, widow of Thomas F. Ivy, deceased, for herself and as next friend of his minor children, Thomas H., A. J. Jr., H. F., C. E., G. A. and Allie Ivy, and also on behalf of Jerry Ivy, his father, to recover damages in the aggregate sum of thirty-five thousand dollars, alleged to have been suffered by them in the death of said Thomas F. Ivey on October 9, 1884, from injuries received while a passenger on defendant's railroad, in a collision between trains, caused by the gross negligence of defendant and its servants in the operation of the trains.

Defendant answered by a general and special demurrer, general denial, plea of contributory negligence and special plea that deceased was on the train as an employe engaged in defendant's service, and the negligence, if any, was that of his fellow servants.

The cause was tried July 1, 1886, when the demurrers were overruled, and plaintiffs had a verdict and judgment for twelve thousand dollars, apportioning the same—two thousand five hundred to the widow, one thousand five hundred to each of the minor children and five hundred to the father. The facts sufficiently appear in the opinion and head notes.

*R. C. Foster* and *A. E. Wilkinson*, for appellants: 1. The answer of witness Torply to the ninth cross interrogatory was improperly excluded. (Rev. Stats., 2237; Lea & Co. v. Stowe, 57 Texas, 449; Lindsay v. Jaffray, 55 Texas, 626; Buford v. Bostick, 58 Texas, 63.)

2. The court erred in admitting the testimony of Espy to statements made in regard to the accident by various persons an hour or two after the wreck. (Dwyer v. Insurance Co., 63 Texas, 356; McGowen v. McGowen, 52 Texas, 663, 664; Adams v. H. & St. J. Ry. Co., 41 Am. Reps., 331; same case, 7 A. & E. R. R. Cases, 414; Meyer v. Virginia and Truckee R. R. Co., 9 Am. and Eng. R. R. Cases, 178; Ross v. Kornrumpf, 64 Texas, 395, 396. If fuller examination of authorities is desired, we would refer also to Ala. G. S. R. R. Co. v. Hawk, 47 Am. Rep., 403; same case, 18 Am. and Eng. R. R. Cases, 194; Am. St. Co. of Phila. v. Landreth, 48 Am. Rep., 196; Hawker v. B. & O. R. R. Co., 36 Am. Rep. 825; Waldell v. N. Y. C. and H. R. R. Co., 47 Am. Rep., 71; same case, 17 Am. and Eng. R. R. Cases, 401; Mutcha v. Pierce, 35 Am. Rep., 776; Lube v. Hud. Riv.

R. R. Co., 3 E. D. Smith, 731; Moore v. C., St. L. and R. Co., 9 Am. and Eng. R. R. Cases, 401; Cure v. Chicago, etc., R. R. Co., 11 Am. and Eng. R. R. Cases, 85; Dietrich v. B. & O. R. R. Co., 11 Id., 115; Patterson v. Wabash, etc., R. R. Co., 18 Id., 130; Balt., etc., R. R. Co., v. State, 19 Id., 83; McDermott v. Han., etc., R. R. Co., 2 Id., 85; P. C. and St. L. R. R. Co. v. Wright, 5 Id., 628; Innis v. Steamer Senator, 54 Am. Dec., 305.)

3. The charge was erroneous in allowing a recovery by plaintiff while an employe and co-employe with the negligent parties. (Price v. Houston Direct Navigation Company, 46 Texas, 537.)

*Harris & Saunders*, for appellees, cited: Taylor v. Chinn, 64 Texas, 388; 80 Kentucky, 399; 55 Penn. State, 402; Dawson v. C. & A. A. R. R., 79 Mo., 296; Harvey v. R. R., 74 Mo., 541; New York Central Railroad Company v. Lockwood, 17 Wall., 357.

COLLARD, JUDGE. It is insisted by the appellant, the Missouri Pacific Railway Company, that Ivy, the deceased, at the time of the collision of trains causing his death, was an employe of the company, and that such being the case, the company would not be liable to his heirs if his death was the result of negligence on the part of his fellow servants. This point is made in several different assignments, and is ingeniously presented by counsel for the company.

One J. P. Higgins shipped cattle on defendant's road from Fort Worth to the stock yards in East Saint Louis, under a contract. There is an agreement endorsed on the back of the contract, and signed by Ivy, as follows: "We the undersigned persons in charge of the live stock mentioned in the within contract, in consideration of the free pass granted us by the Missouri Pacific Railway company, and of the other covenants and agreements contained in said contract, including the rules and regulations at the head thereof and those printed on the back thereof, all of which, for the consideration aforesaid, are hereby accepted by us and made a part of this our contract, and all the terms and conditions of which we hereby agree to observe and be severally bound by, do hereby expressly agree that during the time that we are in charge of said stock, and while we are on our return passage, we shal be deemed employes of said company for the purposes in said

contract stated, and that we do agree to assume, and do hereby assume, all risks incident to such employment; and that said company shall in no case be liable to us for any injury or damages sustained by us during such time, for which it would not be liable to its regular employes."

The first question presented to us by the record, then, is: Was Ivy in fact an employe of the company at the time of his death? The regulations referred to in the foregoing agreement have this provision:

"For the purposes of taking care of the stock, the owner or men in charge * * * will be passed on the train with it, and all persons thus passed are at their own risk of any personal danger whatever, and will sign an agreement to that effect endorsed on the contract."

Looking at the contract itself, we see that it states that the rates charged for the shipping of the cattle are declared to be lower than the usual rates, and in consideration thereof there are many stipulations by the shipper, releasing the company from damages for losses and injury to the stock, and limiting its liability as a common carrier. It also contains substantially the following stipulation by the owner:

3. At his own risk and expense he is to take care of, feed, water and attend to the stock while in the stock yards awaiting shipment, while being loaded, transported, unloaded and re-loaded; he is to unload and reload at feeding and transfer points and at destination, and is to hold the company harmless for any and all loss and damages to the stock while so in his charge, and cared for by him or his agents or employes.

5. When the company shall furnish, for the accommodation of the owner, laborers to assist in loading or unloading the stock, they shall be subject to the owner's orders and deemed his employes while so engaged, for whose acts he agrees to hold the company harmless.

8. The contract forbids the holder or any other person to ride on any train except for the purposes and in accordance with the rules and printed instructions printed on the back of it, all of which are accepted as a part of it.

10. The persons in charge of the stock shall remain in the caboose while the train is in motion," etc.

It is impossible for us to say, from the stipulations in the foregoing contract and regulations, that Ivy was in the employ of the company. It is clear to us that the contract and regu-

lations contemplated he was to be in the employ of the owner
or shipper.   He went along in charge of the cattle, to care for
them, feed and water them, load and unload them, all of which
the owner, by the terms of the contract, was to do at his own
expense and risk.   So careful is the contract to include every
stipulation that would relieve the company from responsibility
for the cattle while in transit, that a clause is inserted making
laborers furnished by the company to aid in attending to the
stock the employes of the shipper and subject to his orders.
We do not intend to say the company would be acquitted from
its ordinary responsibility as common carrier of the stock by
the various provisions of the contract to that effect; but we do
infer from the terms and requirements that the person sent in
charge of the stock had charge of them for the owner, under
his employ as agent and representative.   It seems to us it
could not be seriously contended that he was in the employ of
the company.   He started from Lampasas to attend to the cat-
tle on the way.   They were first shipped on the Gulf, Colorado
& Santa Fe railway to Fort Worth, and there reshipped on de-
fendant's road.   Ivy signed the agreement endorsed on the
back of the contract as the person provided for in the con-
tract or regulations who should attend the cattle in transport
for the owner.   All the facts go to show that he was in the
employ of the owner.   It would be absurd to suppose otherwise.

By the agreement endorsed on the back of the contract he
agrees that he is the employe of the company, but that is evi-
dently a fiction to provide for the release of the company from
damages for personal injuries occasioned by the negligence of
its servants.   It is a pretence, a subterfuge, upon which to
predicate the discharge of the company for damages in a
plausible form.   The true relations of the parties can not be
changed by such an agreement.   It states a fact which is un-
true; the agreement that it is true does not make it so.   It
amounts to this:   Knowing that a contract would be of doubt-
ful validity that absolved the company or limited its liability
as a common carrier of passengers, the contract was devised
in which the passenger acknowledges himself to be an em-
ploye of the company, so as to contract for its limited liability
upon such relation, and give it the semblance of legality.   If
the liability of a common carrier can not be limited in express
terms, and by a direct agreement, it can not be done upon
false or counterfeited relations

Ivy was a passenger on defendant's train, a passenger for hire. It is attempted to make it appear that he passed free of charge for his own accommodation or for the accommodation of his employer, the owner of the cargo. The consideration for his passage is found in the services he renders in taking care of the cattle—a duty the law devolves upon the carrier; or it is found in the charges made for shipping the cattle. The question then arises: Can a common carrier absolve itself from liability or limit its liability for damages for its own negligence or the negligence of its servants? This question has been decided adversely to the appellant by our own Supreme Court. In the case of the Railroad v. McGown (65 Texas, 643) Mr. Justice Stayton decided that a free pass to a passenger with a stipulation indorsed that the holder assumed all risks of accidents to his person, without claim for damages upon the corporation, was a contract, and that it was illegal and contrary to public policy. We quote some of the language of the opinion as authority for our guidance in the case. He says: "In the nature of things the negligence of the agent of whatever grade as to matters within the scope of his employment with reference to passengers is the negligence of the corporation itself, which, all the American cases agree, fixes a liability which the carrier can not be permitted to avoid by contract." "We are further of the opinion," he says, "that a railway company can not by contract lay down its public character as a common carrier of passengers which the law as well as the nature of the employment fixes upon it, and become a private carrier." We need not go on and quote further from the opinion—which is quite exhaustive in argument as well as in citation of authorities. It is sufficient for us that the law is by that opinion well established in this State that, without a statute, to that end, a common carrier can not limit its liability by contract against the negligence of its servants, or its own negligence. In the opinion the court cites approvingly the case of the Railroad v. Lockwood (17 Wall., 357) in which the opinion was delivered by Justice Bradley. Justice Stayton makes free extracts from the case in support of his views, and commends the opinion as one of admirable clearness and fullness.

The Lockwood case was very similar to the one at bar. It was concerning the liability of a common carrier upon a "drover's pass," in which it was agreed that the company should be held harmless for personal injury to himself or whomsoever went

with the cattle. The drover was to go along with his cattle, to load and unload them, assuming all risk of injury to them or of personal injury to himself. The acceptance of the pass was to be considered a waiver of all claims for damages received on the train. After a comprehensive discussion of the question and a careful review of the authorities, both in America and England, Justice Bradley declares such contracts are in contravention of public policy, and reaches the following conclusions:

"*First.* That a common carrier can not lawfully stipulate for exemption from responsibility, when such exemption is not just and reasonable in the eye of the law.

"*Secondly.* That it is not just and reasonable in the eye of the law for a common carrier to stipulate for exemption from responsibility for negligence of himself or his servant.

"*Thirdly.* That the rules apply both to common carriers of goods and carriers of passengers for hire, and with special force to the latter.

"*Fourthly.* That a drover traveling on a pass, such as was given in this case, for the purpose of taking care of his stock on the train, is a passenger for hire."

It would be useless for us to amplify the arguments and reasoning in the two cases above cited—one from our Supreme Court and the other from the Supreme Court of the United States. We are content to follow those cases and adopt their conclusions without further discussion or elaboration of the doctrine. We believe it is and ought to be settled law that a common carrier can not by contract exempt itself from liability for injuries and damages resulting from its own negligence or the negligence of its servants. The public have an interest in the contract which a private individual can not waive. If such liability could be avoided by contract there would at once be an end to the liability altogether.

Our conclusions are that we are to look to the real relations of the carrier and passenger, regardless of any fiction or pretense of agreement, and then to apply the law to declare the liabilities arising from the actual relations of the parties, as the law and public policy demand.

Ivy was a passenger for hire on defendant's train, and defendant owed him the same duties of care that would have been due to any other passenger upon a freight train. Ivy assumed the risk incident to such mode of travel—that is, the

increased risk of riding on a freight as distinguished from a passenger train—but defendant would certainly be liable to him for its own negligence or the negligence of its servants, resulting in personal injury, and it would be liable to his wife, children and father if his death resulted from the gross negligence of its servants. We deem it unnecessary to comment upon the charges of the court objected to, or the charges asked by defendant and refused by the court, as the views herein expressed are sufficient to explain what, in our opinion, is the law of the case.

After defendant's testimony was concluded, Espey, a witness for plaintiff, was recalled by plaintiff and asked: "What, if anything, did you hear any of the employes of defendant say at the time of the collision or immediately thereafter in reference to when or how the front train broke in two?" Defendant's witness had testified that the train had broken in two and left the caboose and one other car behind, which had stopped before the collision occurred. Plaintiff's witness Espey, who was in the caboose with Ivy at the time he was killed, had testified that the caboose had never stopped, but was moving when the collision took place. The evidence was material as tending to show that Ivy had or had not time to get off the caboose before the collision. Defendant's counsel objected to the question because the declarations sought did not appear to be a part of the res gestæ, but were hearsay, and could not be used to impeach defendant's witnesses because no predicate had been laid for their impeachment. Plaintiff's counsel then stated that the evidence was offered as res gestæ. The objections were overruled, defendant excepting. The witness then answered: "I heard it stated on the ground that night that the collision was the cause of the breaking or uncoupling of the train. I can't tell who said it—parties standing around the camp fire there, railroad men and others. This was within an hour or two after the wreck. I don't know whether conductor Torply was present. It was talked over about the fire, and some of the conductors, brakemen and engineers were present. I heard it also asserted that the train had broken in two before the collision and denied by others. Some of the farmers from the neighborhood had gathered there, and there was talk about hanging the engineer. He said he reversed his engine and tried to stop the train, but it did not seem so from the way his engine kept grinding into

the front train." The defendant then moved to exclude the testimony for the same reasons urged in the objection to the question. The court refused to exclude and defendant again excepted.

We do not think the evidence was admissible. It was not a part of the res gestæ. A statement of what parties said so long after the transaction could not be a part of the transaction. (Railway v. Moore, 69 Texas, 157.) In a suit on a policy of insurance, where the insured property was destroyed by fire, a witness for the defendant was permitted, over objection of plaintiff, to state: "There was some talk of arresting all the clerks that night for complicity in the fire," etc.; the Supreme Court of this State declared: "The evidence was but a statement of what persons said who were present at the fire, which, under no rule of law, was admissible." (Dwyer v. Continental Ins. Co., 63 Texas, 356.)

It was error to admit the evidence objected to in this case. The statements of bystanders were not admissible in any event, nor were the statements of employes of the company, made as mere narrations of past events. The talk among the farmers about hanging the engineer was not evidence at all, and was well calculated to prejudice the jury against the defendant.

We also hold that there was error in excluding the answer of Torply to the ninth cross interrogatory, as set out in defendant's bill of exceptions. It is true the answer volunteered to state facts in addition to the matter inquired about, but it was evidence tending in some degree to show that Ivy may have been warned in time to have avoided the danger by the exercise of proper care. It may have had influence with the jury, though it was positively denied by Espey, who was with him at the time. Under the rule, as we understand it, as laid down in Lea & Company v. Stowe, 57 Texas, 449, the objection goes to the manner and form of taking the depositions, and should have been made before the trial, and notice given to defendant. If notice had been given before the trial of the objection the irresponsive part of the answer should have been stricken out.

We are of opinion that, on account of the errors of the court in admitting and excluding evidence, as here pointed out, the judgment of the court below ought to be reversed and the cause remanded for a new trial.     *Reversed and remanded.*

Opinion adopted October 16, 1888.

STAYTON, *Chief Justice.*

[Judge Acker did not sit in this case.]