NEVILL v. GULF, C. & S. F. RY. CO. *
(No. 8357.)

(Court of Civil Appeals of Texas. Ft. Worth. April 22, 1916. Rehearing Denied May 27, 1916.)

1. CARRIERS ⬳284(1)—CARRIAGE OF PASSENGERS — CARE REQUIRED — INJURY FROM FELLOW PASSENGER.

It is the absolute duty of a carrier of passengers to protect them, in so far as it can be done by the exercise of the highest degree of care, from the willful misconduct and violence of their fellow passengers and strangers.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1125, 1127; Dec. Dig. ⬳284(1).]

2. CARRIERS ⬳320(6)—NEWS AGENT—INJURY BY PASSENGER.

Considering a news agent as a passenger, and unless his right of recovery had been taken away by virtue of a release executed to his employer and for the benefit of the defendant road, evidence in his action for damages for injury by a passenger *held* to make the conductor's negligence, in failing to protect him therefrom, a question for the jury.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1126, 1324; Dec. Dig. ⬳320(6).]

3. TRIAL ⬳48 — RECEPTION OF EVIDENCE — EVIDENCE INADMISSIBLE IN PART.

Where certain parts of the excluded testimony were subject to the objection that it was hearsay and inadmissible, it could not be held that the court erred in excluding it as a whole.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 120; Dec. Dig. ⬳48.]

4. CARRIERS ⬳320(6)—ACTION FOR INJURY—TAKING CASE FROM JURY.

Where the evidence bearing upon a railroad's negligence favorable to the plaintiff suing for injury by a passenger, discarding all evidence favorable to the defendant, was sufficient to support a verdict for the plaintiff, the issue of defendant's liability was for the jury.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1126, 1324; Dec. Dig. ⬳320(6).]

5. CARRIERS ⬳241—PASSENGER—RELATION—NEWS AGENT.

Under the state or local law, a news agent employed by a news service and entitled under a contract between his employer and the road to free transportation upon passenger trains, was entitled to the rights, privileges, and protection of a passenger.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 977–979; Dec. Dig. ⬳241.]

6. CARRIERS ⬳307(5)—PASSENGERS—EXEMPTION FROM LIABILITY—VALIDITY.

A news agent entitled under state law to the right of a passenger, even though riding on a pass or accepting free transportation under an arrangement between his employer and defend-

ant road, upon the condition that it would be relieved from liability for injury from its negligence, was not precluded under the state law from recovering damages for such injury.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 1256; Dec. Dig. ⚖️307(5).]

7. CARRIERS ⚖️234—CONTRACT OF TRANSPORTATION—WHAT LAW GOVERNS—EVIDENCE.

A contract or agreement of release by a news agent to his employer and inuring to railroads, made in Texas where both the agent and the defendant road resided, relating to the agent's transportation on defendant's trains, to be performed partly in that state and partly in other states, would be assumed to be intended to be performed, in part at least, under circumstances involving interstate transportation.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 965, 1263, 1538; Dec. Dig. ⚖️ 234.]

8. CARRIERS ⚖️234—PASSENGERS—EXISTENCE OF RELATION—WHAT LAW GOVERNS.

Whether agreement of a news agent, traveling under a contract of interstate carriage, with defendant road releasing claims for injury executed to his employer, inured to the roads over whose lines he might travel under his employment, was to be determined by the federal law.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 965, 1263, 1538; Dec. Dig. ⚖️ 234.]

9. CARRIERS ⚖️307(1) — NEGLIGENCE — CONTRACT EXEMPTIONS—NEWS AGENT—"PASSENGER."

A news agent in the employ of a news service, under whose contracts he had a right to transportation on defendant's passenger trains engaged in interstate commerce, and who, on entering into such service, executed a release of liability for personal injuries of all kinds sustained in the course of his employment, whether the result of the negligence of any railroad or not, inuring to the benefit of such roads, was not a passenger, and hence not entitled to the benefit of the inhibition against stipulations of special contracts limiting the liability of carriers for damages arising out of negligence of their employés.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 1252; Dec. Dig. ⚖️307(1).

For other definitions, see Words and Phrases, First and Second Series, Passenger.]

Buck, J., dissenting in part.

Appeal from District Court, Johnson County; O. L. Lockett, Judge.

Action by Gid D. Nevill against the Gulf, Colorado & Santa Fé Railway Company. Judgment for defendant on directed verdict, and plaintiff appeals. Affirmed.

Johnson & Harrell and S. C. Padelford, all of Cleburne, for appellant. Brown & Lockett, of Cleburne, and Lee, Lomax & Smith, of Ft. Worth, for appellee.

BUCK, J. Gid D. Nevill filed suit against the Gulf, Colorado & Santa Fé Railway Company for damages, alleging: That on November 2, 1912, he was engaged as a news agent, or "butcher," on defendant's train running from Ft. Worth, Tex., to Purcell, Okl. That he was a passenger on the said train during the time he was engaged in said business of "butcher," and his duties being to sell papers, magazines, books, fruits, candies, etc., on the train of defendant for what is known as the Fred Harvey News Service. That prior to said November 2d defendant entered into a contract with said news service for valuable consideration, by the terms of which contract the said Fred Harvey News Service had the privilege and right to sell its wares on the different passenger trains of the defendant in Texas and Oklahoma, and especially on the train referred to in these pleadings, and that under said contract its employés could have and did have a transportation right over the lines and on all passenger trains of the defendant, and that the said employés of the said news service company did, and would, have the right to canvass said trains in selling its articles and wares, and that by virtue of said contract the employés of said news service company for valuable consideration were permitted to ride on the defendant's passenger trains aforesaid, and that all the rights and privileges of a passenger were conferred upon said employés of the news service company while they were on said trains. That on November 2, 1912, while plaintiff was traveling on defendant's train, as a passenger from Ft. Worth, Tex., one Val Mullins was on said train, having boarded the same at Ft. Worth, for Ardmore, Okl. That while the plaintiff was in the discharge of his duties as a passenger and as the agent and employé of said Fred Harvey News Service, and while he was going through the car and coach upon which the said Val Mullins was being carried and was traveling as a passenger, and while he was in the county of Cooke, state of Texas, said Val Mullins insulted him, and threatened violence to plaintiff, and threatened that, if plaintiff should come back into the coach where he, the said Mullins, was, he would throw him out of said car and would injure him, after they had crossed Red River and gotten into Oklahoma. That, at the time this threat was made, Val Mullins was angry. That plaintiff immediately went to the conductor of defendant's train and reported what Val Mullins had said, and asked the protection of the conductor. That the conductor then ordered and directed the plaintiff to go back through said car where Val Mullins was and to attend to his business, and not to pay any attention whatever to said Mullins. That said conductor did not go with plaintiff, or in any way protect, or attempt to protect, the plaintiff from the threatened violence on the part of said Val Mullins. That, in accordance with the direction and instructions of the conductor, plaintiff, while the train was passing through Love county Okl., went back into the coach where Val Mullins was, and proceeded to perform the duties connected with his business as a news agent. That in so doing he did not notice, or speak to, or do anything to, the said Mullins, but, after he had passed said Mullins in said car, Mullins arose

from his seat and, with a show of great anger, grabbed the plaintiff, and pulled out a very large pistol, or six-shooter, and hit plaintiff over the head several times, cutting through the scalp and injuring the bone, knocking plaintiff down. That, as plaintiff attempted to defend himself, the said Val Mullins shot the plaintiff in his left arm and right leg, thereby injuring and crushing his shoulder and hip. That Val Mullins was a very large muscular, and active man, and that plaintiff was a small man and very much inferior in strength and size to said Mullins.

Plaintiff further alleged that, because of the injuries aforesaid, he was permanently incapacitated from performing his accustomed duties, or any other similar labor. Plaintiff further alleged that the defendant railway company, and its conductor and brakeman in charge of the train, knew that Mullins was a dangerous and quarrelsome man, and knew that he was under the influence of intoxicating liquors, and that while he was under such influence he was a very dangerous man, and that he would in all probability carry into effect any threats made at such time, and that the defendant and said employés were negligent in failing to take the proper and necessary steps to protect plaintiff from the threatened violence at the hands of Val Mullins. It was further alleged that plaintiff did not know of the character and disposition of Val Mullins. Damages were alleged in the aggregate sum of $50,000 covering loss of time, pain and suffering, medical services, hospital fees, and nurse hire, etc.

Defendant answered, and, after general demurrer and special exception, answered in substance: That plaintiff did not have the rights and privileges of a passenger while on the defendant's train. That the defendant, by virtue of the contract between it and Fred Harvey, permitted the plaintiff to travel on its trains as a news "butcher" from Ft. Worth, Tex., to Newton, Kan., and while Val Mullins was on said train, accompanied by his wife and another lady, and occupying the rear seats in the chair car of said train, plaintiff had repeatedly approached the ladies who accompanied said Mullins, offering them his fruits and other merchandise, and insisting upon their purchasing from him, and had been advised by the ladies that they did not care to make such purchases. That the plaintiff sat on the arm of the chair or seat occupied by said ladies, and used familiar and insulting language to them, calling them "girlies," etc., whereupon Mullins told plaintiff that they did not wish to buy any of his wares and that there was no occasion for plaintiff to come where they were any more. But the plaintiff persisted in his attention to the ladies and in his offensive and familiar conduct towards them, and the said Mullins told the plaintiff that if he continued to annoy them he, Mullins, would give plaintiff a kick after they crossed Red river. That, after this conversation with Mullins, plaintiff came to defendant's conductor and asked him if anybody had the right to tell him, plaintiff, not to go through the whole train, to which defendant's conductor replied that "he did not think so." Thereafter plaintiff advised the said conductor that he had been directed by Mullins not to come back to where Mullins was and not to bother him any more, whereupon defendant's conductor told the plaintiff that Mullins was going to leave the train pretty soon, and directed the plaintiff to leave said Mullins alone, and not to bother him. Defendant further alleged that, in disregard of the direction given by the conductor, plaintiff continued to go in that portion of the car where said Mullins was, and when near the town of Marietta, Okl., plaintiff approached said Mullins and renewed the difficulty with him, and struck and stabbed the said Mullins with a knife, and that the injuries received by plaintiff were received in the difficulty provoked and brought on by plaintiff, and not because of any negligence of defendant or its employés.

Defendant specially pleaded that at the time plaintiff entered the service of the Fred Harvey Company, and as one of the considerations for entering said service, he, plaintiff, executed on, to wit, October 9, 1912, a certain release which recited that the employment of plaintiff by the said Fred Harvey Company was made upon the condition of his executing said release and agreement. Said release reads, in part, as follows:

"Now, therefore, in consideration of the premises and of my said employment and of being carried on the cars of said companies as such news agent under said contracts where my business or employment under the direction of the said Fred Harvey may call me, I do hereby assume all risks of accidents and injuries of every kind which I shall meet or sustain in the course of my employment, or which may occur to me on any of said railroads on which I may be by virtue of my employment, whether such accident or injury be occasioned or result from the gross or other negligence of any corporation or person engaged in any manner in operating any such railroad, or any employé of any such corporation or person, or otherwise, and whether resulting in my death or otherwise; and neither said Fred Harvey, its successors, or assigns in business, or any of said railroad companies, including the receiver thereof, shall be liable to me or to my personal representatives, or to any other person claiming under me, in any manner for any injury or damage that may happen to me by reason of such accidents or injuries; and I hereby agree to indemnify and save harmless the said Fred Harvey, its successors and assigns in business, of and from any and all claims which may be made against it or them, or its property, by any corporation or person under any agreement which it has made or may hereafter make arising out of any claim or recovery upon my part or the part of my representatives for damages sustained by reason of my injury or death, whether such injury or death result from the gross negligence of any person or corporation or any employé of any person or corporation or otherwise."

Supplemental pleadings were filed by both plaintiff and defendant, but we think the

above statement of issues made by the pleadings is sufficient for the purpose of this opinion. After the submission of the cause to a jury and the introduction of evidence, the court gave the following instruction:

"The court instructs you to return a verdict in this case in favor of the defendant, the Gulf, Colorado & Santa Fé Railway Company. The court gives this instruction for two reasons: (1) Because the evidence in this case fails to show any liability on the part of the defendant; and (2) if there was any evidence of the defendant's liability, the case of Northern Pacific v. Adams, 192 U. S. 440, 24 Sup. Ct. 408, 48 L. Ed. 513, holds that (under) the plaintiff's contract with the news company agrees (agreeing) to relieve said news company and the railroad upon which plaintiff was allowed free of paying any fare, that plaintiff would assume the risk of any injury occurring to him, and under said decision plaintiff cannot recover in this case."

The jury having returned a verdict for defendant in response to the court's instruction, and judgment having been rendered thereon, the plaintiff appeals.

In order to determine the question of whether or not the court was authorized to peremptorily instruct a verdict for defendant, we will have to decide: (1) Whether plaintiff stated a cause of action in his pleadings, regarding plaintiff as a passenger, and (2) whether the evidence, given a construction most favorable to plaintiff, sustains the allegations pleaded.

[1] Plaintiff alleged that he was a passenger and entitled to the privileges and rights of, and that degree of care due a passenger. As is said in the recent and valuable work of Moore on Carriers, vol. 2, p. 1146, § 25:

"It has been steadily maintained by the courts that it is the absolute duty of a carrier of passengers to protect them, in so far as this can be done by the exercise of the highest degree of care, from the negligence, willful misconduct, violence, insult, and ill treatment of its servants, while performing the contract of carriage, and from the violence and insults of their fellow passengers and strangers, so far as practicable; and whether this duty arises from contract or from the nature of the employment becomes unimportant, since the duty goes with the carrier's contract, however made, whereby the relation of carrier and passenger is established. The law seems to be now well settled that the carrier is obliged to protect its passenger from violence and insult, from whatever source arising. It is not regarded as an insurer of its passenger's safety against every possible source of danger, but it is bound to use all such reasonable precautions, as human judgment and foresight are capable of, to make its passenger's journey safe and comfortable."

See, also, Dallas Consolidated Electric Street Ry. Co. v. Gilmore, 138 S. W. 1134; Dillingham v. Russell, 73 Tex. 47, 11 S. W. 139, 3 L. R. A. 634, 15 Am. St. Rep. 753; Ry. v. Mackie, 71 Tex. 491, 9 S. W. 451, 1 L. R. A. 667, 10 Am. St. Rep. 766; Hutchinson on Carriers (2d Ed.) p. 626, § 548 et seq.; T. & P. Ry. v. Johnson, 2 Willson, Civ. Cas. Ct. App. § 188; T. & P. Ry. v. Hughes, 41 S. W. 821; M., K. & T. Ry. v. Gerren, 57 Tex. Civ. App. 34, 121 S. W. 905; G., C. & S. F. Ry. v. Bell, 165 S. W. 1.

[2-4] The next question for our considera-

tion is, did the plaintiff's evidence, taken in its strongest probative effect, make out a prima facie case of negligence on the part of the conductor, in failing to exercise that high degree of care due a passenger to protect him from threatened injury at the hands of a fellow passenger? Plaintiff testified upon this question, in part, as follows:

"I got on the train about 8:20 or 8:30 that night; this train was bound for the north, to Gainesville, Marrietta, Ardmore, and other towns north and to Newton, Kan. I had my magazines, books, candies, fruits, tobaccos, chewing gum, etc., on the train and had them in the smoker in a place that is set apart for that purpose. I was allowed to occupy two seats in the rear end of the smoker, had two seats turned facing each other, and had my stuff on them. The 'news butch' is allowed to occupy two seats and no more with his wares and goods that he has for sale on the train, and I had my stuff on these two seats. * * * On the occasion in question I was on passenger train No. 6, belonging to the Gulf, Colorado & Santa Fé Railway Company. After we left Ft. Worth, I worked my train between stations in the usual way that I have described above. I would just go through the train with my papers, books, magazines, candies, and things, and call them out to the passengers. Just after leaving Ft. Worth and after the conductor had gotten through taking up the transportation, I started out and went through the train calling off my stuff in the manner described. At Ft. Worth, there was a man by the name of Val Mullins, and two ladies with him, got on the train I was on. I did not know who they were at the time but afterwards learned who they were. These people all sat in the rear end of the chair car, the last chair car. My recollection there were in this train, a smoker, a chair car and a swing car, the swing car being between the smoker and the chair car. There were some sleepers on the train also, but the sleeping cars were on behind the chair car. In other words, there were two cars in which passengers were riding ahead of the chair car.

"I went ahead in the usual way and worked the train in the usual way, going through and calling off my stuff for sale, papers, magazines, candies, and fruits, etc. When I began to get on up the line, I noticed this fellow Mullins; he was sitting on the right-hand side of the chair car in the rear of the chair car; he was asleep and he was on the very last seat on that side of the car, and he looked like a drunk man; his face was red. There were two ladies sitting over on the other side of the car across the aisle from him. I worked my train, and the first thing I said to these ladies or to these folks, or they said to me—these two ladies were sitting in the rear of the chair car, and I had a basket of fruit, and one of these ladies asked me if I had any chocolate candy, and I told her, 'Yes ma'am,' and she asked me to bring back some. I didn't have it with me at that time, and I told her I would bring it. I went back and brought in some candy and had a 25-cent box of chocolate candy. She asked me what it was worth and I told her 25 cents, and she wanted to know if I had any that was cheaper, and I told her that I had some for 10 cents. She said that would do and paid me 10 cents for a box of chocolate candy, and I thanked her and went on back. This occurred a right smart piece this side of Gainesville, but I do not remember what place. At the time I sold this candy to the ladies, they were sitting on the east side of the train and Mullins was sitting on the west side, and the train was going north. * * * After I sold this candy I came back through the car, but I do not remember just what I had for sale that time;

I didn't say anything to these folks at all the next time I was back through the car. Then the next time I came through—this was before I got to Gainesville—I had my books * * * I came to these ladies sitting in the rear end of the car and called off the books, and one of the ladies stopped me and says, 'What kind of books have you?' I told her I had a nice lot of books and some of the latest books out, and named some of them and called her attention to the book 'Their Yesterdays' by Harold Bell Wright. * * * She said she would like to read the book, but that she would not take it that day. About that time this man woke up and grabbed me by the sleeve, and shook me, and says, 'Get on out of here, and don't you come back in here any more.' He says, 'Get on out of here and don't come back.' He says, 'I had trouble with one —— —— —— of· a news agent, and if you come back in here after we cross Red river, I'll throw you out of the window.' I kinder laughed and says, 'You just think you will,' and turned around and walked back and set my basket down.

"I walked back to the smoker where my stuff was and set the basket down, and I went back through the smoking car into the negro car where Mr. Granger, the conductor, was. I went in there and told Mr. Granger that there was a man back there, and told him where he was sitting in the rear end of the chair car, and I told him that he was drunk and that he had threatened to throw me out of the window after we crossed Red river, and I told him the words that this man said. I says, 'There is a man back there drunk, he told me to go on out and not come back, and says if I come back in there after we cross Red river that he will throw me out of the window.' I told him that he was a mean-looking man and that I was afraid of him. Mr. Granger says, 'Go on and work your train.' He told me the second time to go on and work the train. He says, 'I know him, it is old Val Mullins,' and he says, 'He is drunk, go on and work your train,' and I went on back and worked the train. That was before I got to Gainesville, and I don't think I went in there any more before we got to Gainesville. After we passed Gainesville, Mr. Granger went through the train and took up the tickets, and after this I went back through and worked the train, after Mr. Granger had been through ahead of me. That was after we passed Gainesville, going north. Yes, I saw Mullins that time when I went through the train. I went on back and I did not go close to Mullins, but I stopped within three or four seats of him; I would stop at the last man on this side of him. * * * I did not go clear on back through the car any more; that was between Gainesville and Thackerville, I think, on the other side of the river. After we passed Thackerville, I came back into this chair car. I had a basket of candy and I went back there in the car, and, as I went in there were one of these ladies sitting over here in the east side where there had been two ladies, and this Val Mullins that had been sitting on the west side was standing up in the back of the chair car, right in the aisle, at the water cooler, getting a drink of water. He had a cup in his hand. I worked my train on down, and when I got to this last man he asked me what the candy was worth and I told him. While we were standing there talking, Val Mullins walked right by me coming up to the front end of the car, and, about the time he walked by me, I turned around to go back to my stuff and he just wheeled around—he did'nt walk by me, but he just wheeled around and knocked me in the head with a six-shooter."

Then follows plaintiff's description of the encounter; his testimony being to the effect that he did not make any resistance, nor use a knife, one he had for cutting grapes, etc., on Val Mullins until after he had been hit on the head several times with the pistol, and that after he had cut Mullins several times the latter fell backwards in the aisle and that plaintiff tried to run over him, and that Mullins kicked plaintiff into the aisle, and that, as he started over him the second time, Mullins shot him in the right leg, breaking the bone all to pieces, and also shot him in the arm, and that plaintiff fell on top of Mullins.

T. H. Benninger, a witness for plaintiff, and in the jewelry business and residing at Cleburne, testified that he was on the train at the time of the difficulty and in the same coach with Mullins and the ladies mentioned, and heard Mullins say something to plaintiff about throwing him out of the window after he crossed Red river. That after the train passed Thackerville, plaintiff went back towards the read end of the car and near to where witness was sitting, and that he had hardly passed witness until the latter heard scuffling, and raised up and looked over the back of the seat, and that Mullins was rapping the boy over the head with his gun. It seems that Benninger got down behind his seat about this time, and did not see all of the rest of the difficulty but heard the shots fired.

J. R. Holloway, the brakeman, testified by deposition and stated that he thought Nevill was in the aisle when he was shot, about halfway between the center of the car and the rear end; that, when he got into the car after the shooting, Nevill was lying in the aisle on his back and was not doing anything; that Granger was up about the head end of the car about the time of the difficulty, and was probably on the ground, the train having slowed up at Marietta.

On cross-examination, plaintiff testified that he did not think, at the time he went in the car immediately before the difficulty, that there was any danger to him from Mullins. Appellee urges that, since the plaintiff himself did not apprehend any danger in going into the car after the alleged threat on the part of Mullins, the conductor could not be held chargeable with negligence in failing to take steps to protect plaintiff against any threatened attack by Mullins. But appellant urges with some force that plaintiff did not know Mullins or his character or reputation with reference to being a violent and dangerous man, and that the conductor and brakeman in charge of the train did know that Mullins was a dangerous and fighting man and were advised of facts, including a previous difficulty on Val Mullins' part with another news butcher while Mullins was a passenger on one of defendant's trains, in charge of the same conductor and brakeman. Plaintiff reserved a bill of exceptions, to the exclusion of certain testimony of the witness Holloway, with reference to the previous difficulty between

Mullins and the other news butcher, and the bill sets out at length, in question and answer form, the questions asked this witness, the answers thereto, to the exclusion of which, by the court, error is assigned; the bill in part reading:

"The plaintiff offered each and every question and answer above, and to each and every question mentioned above the defendant objected, for the reason that the same was hearsay and was inadmissible and irrelevant; the testimony was offered for the purpose of showing that the defendant, through its agent, J. Granger, knew that Mullins was a dangerous, fighting man, and also to corroborate the plaintiff's testimony as to what Mullins told him with reference to having had a difficulty with a former news butcher, and to what the plaintiff told the conductor just after Mullins had threatened him, as is shown by the testimony in this case."

While the appellant has presented an assignment to the exclusion of this testimony, such assignment is directed to the exclusion of the testimony as a whole; and we are inclined to think that certain portions of the excluded testimony were subject to the objection urged, and therefore we are unable to hold that the court erred in excluding said testimony as a whole.

Plaintiff's testimony heretofore set out was sharply contradicted by defendant's witnesses, including the conductor, upon practically all of the issues of fact presented, but in determining the question now before us we must be guided by the probative effect of plaintiff's testimony. Where the evidence bearing upon the defendant's negligence favorable to the plaintiff, discarding all evidence favorable to the defendant, is sufficient to support a verdict for the plaintiff, the issue of defendant's liability is for the jury. Lumber Co. v. Railway Co., 106 Tex. 12, 155 S. W. 175; Howard v. Waterman Lumber & Supply Co., 134 S. W. 387. Unless plaintiff's right of recovery has been taken away by virtue of the release executed to the Fred Harvey Company, and for the benefit of defendant railway company, which question we will later consider, and considering plaintiff as a passenger at the time of the injury, we are of the opinion that the testimony heretofore set out presents an issue of negligence on the part of the conductor which should have been submitted to the jury under appropriate instructions.

[5, 6] Under the holdings of our state Supreme Court and Court of Civil Appeals, if plaintiff was a passenger, he would not be precluded from recovery for injuries sustained by reason of the negligence of defendant's employés, even though he was riding on a pass or was accepting free transportation, which pass or transportation had been issued by the railway company upon the condition that it would be relieved from responsibility for injuries received, by the user thereof, from defendant's negligence. The common carrier of passengers cannot by contract relieve itself from responsibility, or even limit its liability, for injuries to a passenger resulting from the negligence of itself or its employés or agents, in the scope of their employment, and this is so with reference as well to passengers traveling free of charge as to those paying full fare. G., C. & S. F. Ry. v. McGown, 65 Tex. 640; Sullivan-Sanford Lbr. Co. v. Cooper, 105 Tex. 21, 142 S. W. 1168; Sullivan-Sanford Lumber Co. v. Watson, 106 Tex. 4, 155 S. W. 179; Ry. v. Flood, 70 S. W. 331; Ry. v. Ivy, 71 Tex. 409, 9 S. W. 346, 1 L. R. A. 500, 10 Am. St. Rep. 758. In the case of T. & P. Ry. Co. v. Fenwick, 34 Tex. Civ. App. 222, 78 S. W. 548, writ of error denied (no opinion), it was held by this court that under the Constitution (article 10, § 2), declaring railroads public highways, and railroad companies common carriers, and Sayles' Anno. Civil Statutes 1897, arts. 319, 320, imposing on railroads common-law duties and liabilities, and forbidding them to limit or restrict such liability, by general or special notice, or any contract whatever, a railroad cannot contract away its liability for injuries to a newsboy employed by another corporation to sell its wares on the trains of the railroad by an antecedent release, though the execution thereof by the newsboy is imposed as a condition of affording him transportation.

In G., C. & S. F. Ry. Co. v. Wilson, 79 Tex. 371, 15 S. W. 280, 11 L. R. A. 486, 23 Am. St. Rep. 345, it is said:

"Essentially the relation of carrier and passenger exists in every case in which the carrier receives and agrees to transport another not in its employment, whether this be by contract between them or between the carrier and some other person in whose employment the person to be carried is, for the purpose of transacting on the train the business of his employer, as in case of mail agents, express agents or messengers, and others having duties to their employers to perform, which can be performed only by such persons traveling on railway trains or other public conveyances. Whether the public carrier of passengers receives an agreed compensation for the transportation of such persons, is compensated therefor by the charge for the car or transportation of the property of which the person to be carried has charge, or receives no compensation whatever for the carriage of such a person is a matter of no importance. It is enough that he is lawfully on the car and entitled to transportation to give to him the character of passenger and to entitle him to recover for an injury resulting from the negligence of the carrier or its servants, if this occurs without fault on his part."

We therefore conclude that under our state, or local, law plaintiff was entitled to the rights, privileges, and protection of a passenger, and that, being a passenger, he would not be precluded from recovery by virtue of the release agreement theretofore executed by him, such stipulation being held against public policy in Ry. v. Flood, supra, and other cases cited.

[7, 8] We now come to the question as to whether the state law, or the federal law, should apply in the determination of the effect of this release agreement. It is both pleaded and shown by the evidence that when plaintiff was injured he was taking an inter-

state trip, plaintiff alleges from Ft. Worth to Purcell, Okl., while defendant alleges from Ft. Worth to Newton, Kan. His right of transportation depended (1) on the contract made between the defendant railway company and the Harvey Company, and (2) upon the contract of employment between plaintiff and said Harvey Company. That is, plaintiff became entitled to the benefits of transportation over defendant's lines under and by virtue of his contract of employment with the Harvey Company, a condition of which employment was the execution of the release agreement hereinabove set out. Hence it appears that plaintiff, at the time of his injuries, was traveling under a contract of interstate carriage with defendant company, whose terms are to be controlled by the provisions of the two contracts mentioned, which stipulated that the benefits thereof should inure to the railway companies over whose lines plaintiff might travel under his employment with the Harvey Company. We are aware that it has been held that a contract of interstate carriage, evidenced by a ticket, is governed by the law of the state where made. G., H. & S. A. Ry. Co. v. Wiseman, 136 S. W. 793 (writ of error denied); Sawyer v. El Paso & N. E. Ry. Co., 49 Tex. Civ. App. 106, 108 S. W. 719; E. P. & N. E. Ry. Co. v. Sawyer, 54 Tex. Civ. App. 387, 119 S. W. 110; Mexican Nat. R. Co. v. Ware, 60 S. W. 343; Wharton on Conflict of Laws, § 471b; Robert v. C. & A. R. Co., 148 Mo. App. 96, 127 S. W. 925. We are of the opinion that this rule of law is subject to the limitation that, where Congress has assumed to legislate concerning a matter constitutionally within its authority, such federal legislation would have controlling effect, and that the federal law, as found and announced by the Supreme Court of the United States, would supersede the state or local law. It has been held in the case of C., I. & L. Ry. Co. v. United States, 219 U. S. 486, 31 Sup. Ct. 272, 55 L. Ed. 395, that where a state statute authorizes a railway company, incorporated under the laws of the state, to issue transportation in payment for printing and advertising, such statutes must give way, so far as interstate transportation is concerned, to the provisions of the act to regulate commerce under which a carrier can accept nothing but money in exchange for interstate transportation. Other cases to the same import might be cited, to wit: Sinnot v. Davenport, 22 How. 227, 243, 16 L. Ed. 243, 247; M., K. & T. Ry. v. Haber, 169 U. S. 613, 626, 18 Sup. Ct. 488, 42 L. Ed. 878, 882; Reid v. Colorado, 187 U. S. 137, 23 Sup. Ct. 92, 47 L. Ed. 108.

While the contract, or agreement of release, executed by plaintiff to the Fred Harvey Company was made in Texas, and both plaintiff and defendant are residents of Texas, yet it must be assumed, from the circumstances pleaded and the evidence, that it was intended by the parties thereto that the contract should be performed, in part at least, under circumstances involving interstate transportation. It was held in the case of Ryan v. M., K. & T. Ry. Co., 65 Tex. 13, 57 Am. Rep. 589, that, where a contract is to be performed partly in one state and partly in another, the intention of the parties gathered from the surrounding circumstances must govern. And in H. & T. C. R. Co. v. Park, 1 White & W. Civ. Cas. Ct. App. §§ 332, 335; Mo. Pac. Ry. Co. v. Harris, 1 White & W. Civ. Cas. Ct. App. § 1260; T. & P. Ry. Co. v. Davis, 2 Willson, Civ. Cas. Ct. App. § 191; Ry. Co. v. Whitehead, 6 Tex. Civ. App. 595, 26 S. W. 172, in construing article 708, Vernon's Statutes, prohibiting the limiting or restricting of the liability, as it exists at common law, of common carriers of goods, wares, and merchandise for hire within this state, by any general or special notice, etc., it was held that the article did not apply to interstate carriage or traffic, but only to intrastate. While, as hereinabove noted, and as might be further shown by citation of authorities, there exists some contrariety of views and holdings upon this question, yet the majority are of the opinion that the better and more reasonable view is that contracts involving interstate carriage or traffic, where Congress has assumed to legislate thereupon, must be construed in the light of the federal decisions. In 5 R. C. L. p. 912, § 6, it is said:

"The authority of the United States government is supreme in its cognizance of all subjects which the Constitution has committed to it. Consequently there can be no conflict of authority between a state and a law of the United States in respect to such a matter; the former being always subordinate and the latter paramount. And so a state law which contravenes a valid law of the United States is void, for in legal contemplation there can no more be two valid conflicting laws operating on the same subject-matter, at the same time, than in physics two bodies can occupy the same space at the same time. If an act of Congress has been construed by the Supreme Court of the United States, the decision of that court controls, and the state courts are bound by it; but until it has received a construction from the highest national tribunal, the various state courts are free to exercise their own judgment in determining the effect. In cases not involving a national question, however, the decisions of the United States courts are not necessarily binding precedents to be followed by state courts. The mere fact that Congress has power to legislate in regard to a certain subject does not exclude the right of the states to legislate on the same subject, except when the power is actually exercised by Congress and the state laws conflict with those of Congress."

In section 25, p. 931, Id., the following language is used:

"It is a familiar rule that the construction and validity of a contract is governed by the law of the place where it is made. This rule is based on sound reason as well as authority; for, while persons have their places of domicile, and property has its situs, it is clear that, apart from the law itself in contemplation of which either expressly or impliedly a contract is made, there is nothing of a discernible nature that can serve to aid the courts in determining the complicated questions of conflict that con-

tinually arise. * * * If the place where the contract is made is also the place where it is to be performed, there is ordinarily no doubt as to the application of the rule, for then the lex loci contractus and the lex solutionis are the same. The presumption in the absence of any indication to the contrary will always be that a contract is to be performed at the place where it is made."

In section 26, p. 935, Id., it is further said: "Some of the authorities apparently overlook the fact that the place of execution may be different from that of performance, and in these it is stated that contracts are to be governed by the laws of the country in which they are made or are to be performed. The Supreme Court of the United States has laid down the following rules in reference to the law governing contracts, in cases in which the place of making and the place of performance are not the same. (1) Matters bearing upon the execution, interpretation, and validity are determined by the law of the place where the contract is made; (2) matters connected with the performance are regulated by the law of the place where the contract, by its terms, is to be performed; (3) matters relating to procedure depend upon the law of the forum."

The majority are of the opinion that the question as to whether plaintiff, at the time of his injury, was a passenger must be determined by the United States Supreme Court holdings, inasmuch as the contract of transportation involved interstate carriage. Myrick v. M. Cent. R. Co., 107 U. S. 102, 1 Sup. Ct. 425, 27 L. Ed. 325.

[9] It was held in the case of B. & O. S. W. Ry. Co. v. Voigt, 176 U. S. 498, 20 Sup. Ct. 385, 44 L. Ed. 560, that an express messenger occupying an express car in charge of express matter, in pursuance of a contract between a railroad company and the express company, is not a passenger within the meaning of the rule of public policy, which denies the validity of contracts limiting the liability of a carrier to a passenger for negligence, and cannot recover of the railroad company for injuries sustained in a collision, where the contract between the companies exempts the railroad company from such liability, while his own contract, voluntarily entered into as a condition of employment, assumes all such risks, and stipulates that he will indemnify and hold his employer harmless from all liability for such accident or injury. It is true that in some respects the conditions of carriage differ in the case of an express messenger from those in the case of a news agent, in that, in the first instance, a special car is provided for his transportation, and he does not come in contact with other persons traveling on the train, and is not subject to dangers arising from contact or conflict with other passengers; while, in the second instance, his duties require that he travel in the passenger coaches and meet and wait upon the passengers generally. But the majority have concluded that there is no real or essential difference in the character of the two employments, or in the nature of the two contracts between the railway company and the express company on the one hand, and the rail-

way company and the news company on the other, and that in neither case can the railway company be said to be holding itself out as a common carrier of the employés of the other company, but undertakes to transport said employés by virtue of a private contract between the railway company and the express company or the news company. As was said by Justice Shiras, delivering the opinion of the court in the cited case:

"It is evident that, by these agreements, there was created a very different relation between Voigt and the railway company than the usual one between passengers and railroad companies. Here there was no stress brought to bear on Voigt as a passenger desiring transportation from one point to another on the railroad. His occupation of the car, specially adapted to the uses of the express company, was not in pursuance of any contract directly between him and the railroad company, but was an incident of his permanent employment by the express company. He was on the train, not by virtue of any personal contract right, but because of a contract between the companies for the exclusive use of a car. His contract to relieve the companies from any liability to him, or to each other, for injuries he might receive in the course of his employment was deliberately entered into as condition of securing his position as a messenger."

In the recent case of Robinson v. B. & O. R. Co., 237 U. S. 84, 35 Sup. Ct. 491, 59 L. Ed. 849, in an opinion by Justice Hughes, the United States Supreme Court follows the Voigt Case and applies the same reasoning and ruling with reference to a Pullman Company car porter, who had been injured while traveling on the railroad company's train and who had, prior to or at the time of his employment with the Pullman Company, executed a release similar to that shown in the Voigt Case and to the one in the instant case. In the Robinson Case just cited, the question was discussed as to whether the release was invalid under section 5 of the Employers' Liability Act of April 22, 1908 (35 Stat. L. 65, c. 149, Comp. Stat. 1913, § 8657), which provides that any contract, the purpose, or intent of which shall be to enable any common carrier to exempt itself from any liability created by this act, shall to that extent be void. It was decided by the Supreme Court that the porter, who was employed by and was under the control of the Pullman Company, could not be held to be an employé of the railroad, although there was a contract between the railroad company and the Pullman Company, as in this case between the railway company and the Harvey Company, by virtue of which the railway company received a portion of the contingent profits arising from the conduct of the joint business. In the Robinson Case, also, it was decided that the plaintiff was not a passenger, and was not entitled to the benefits of the inhibition against stipulations of special contracts, limiting the liability of common carriers for damages arising out of negligence of their employés.

In the judgment of the majority, the trial court did not err in instructing a verdict for

defendant, and all assignments are overruled, and the judgment is affirmed.

BUCK, J. (dissenting). I cannot concur with the conclusion of my Brethren that the decision as to whether or not the plaintiff was a passenger at the time of his injuries must be determined by the federal law. The defendant company undertook to transport plaintiff over its lines under and by virtue of two certain contracts, the one entered into by and between the railway company and the other between the plaintiff and said Harvey Company. The so-called release contract, hereinbefore set out in the majority opinion, and the provisions of which it is claimed by appellee inure to its benefit, provides for the transportation of the plaintiff over certain railroads not designated by name, and not shown to be interstate lines; and in consideration of said transportation plaintiff purported to release said railroads from any liability for injuries arising by reason of the negligence of the servants of said railroad companies or otherwise. By the authority of our state Supreme Court and Court of Civil Appeals, some of the decisions being cited in the majority opinion, this contract of release was invalid. Under the well-recognized rule of construction of contracts, that its terms and provisions must be taken most strongly against the party writing the same, this contract should be given the construction as providing for intrastate transportation in the main. 4 R. C. L. p. 803, section 261, says:

"It is an elementary rule of construction that, if a written contract reasonably admits of two constructions, that one is to be adopted which is least favorable to the party whose language it is. To no class of contracts has this rule been applied more stringently than to those in which common carriers seek to limit their liability as it exists at common law. * * * Moreover, the courts look with jealousy on the attempts of common carriers to free themselves from the responsibilities placed on them by the policy of the common law, because of the public nature of their employment and the inequality of the parties to these contracts. All these considerations, therefore, have led to the adoption of a rule, now indubitably established, that any limitation of liability by a common carrier in a bill of lading will, in case of ambiguity, be strictly construed and that construction adopted which is the most favorable to the shipper."

Section 263, p. 805, Id., says, in part, as follows:

"However, in general, it may be said that this matter is governed by the rules as to conflict of laws generally applicable to other contracts. So, if the contract is made and to be wholly performed within one state, the law of that state will govern its validity even where it is brought into question in the courts of another state; and the same rule obtains where a contract for carriage is issued in one state to be performed in several states, among them the state in which the contract was entered into. In such cases, the law of the state where the contract was made and partly performed will govern, even if it was also partly performed in the state in which the validity of its terms is brought into question."

"It is generally agreed that the law of the place where the contract is made is prima facie that which the parties intended, or ought to be presumed to have adopted, as the footing upon which they dealt, and that such law ought, therefore, to prevail in the absence of circumstances indicating a different intention." 5 R. C. L. § 27, p. 939.

Under the law as prevailing in this state, where the contract was made and where both plaintiff and defendant reside, plaintiff is held, under the circumstances and terms of his employment, to be a passenger. T. & P. Ry. Co. v. Fenwick, 34 Tex. Civ. App. 222, 78 S. W. 548. Therefore it seems to the writer that the parties to the contract of carriage should be held to have entered into the contract with a knowledge of the law as it exists in this state, that under such contract plaintiff would be held to have the rights, privileges, and protection of a passenger while on defendant's train, and that the purported release contract entered into by and between plaintiff and the Harvey Company, the benefits of which are claimed by the railway company, was invalid in so far as it purported to limit the liability of the railway company for accidents arising from the negligence of its employés.

If this view of the question be sound, and in the opinion of the writer it is sustained by practically all of the authorities, it becomes unnecessary to determine whether or not the conditions of employment and the circumstances of transportation with reference to an express messenger or a Pullman car porter are different from those pertaining to a news agent. However, the writer is of the opinion that the conditions and circumstances are essentially different, but does not place his dissent, entirely or principally, on that ground.

Without desiring to extend the expression of the reasons for his dissent further, the writer wishes respectfully to enter his dissent from the final conclusions reached by the majority of the court. In his opinion, the judgment of the trial court should be reversed and the cause remanded.